[No. 8521–2–I. Division One. April 19, 1982.]

STEVE WAGNER, *Respondent,* v. FLIGHTCRAFT, INC., ET AL, *Appellants.*

DOROTHY WALTHERS, *Individually and as Administratrix, Respondent,* v. FLIGHTCRAFT, INC., ET AL, *Appellants.*

JOHN P. KALBRENER, *Respondent,* v. FLIGHTCRAFT, INC., ET AL, *Appellants.*

*Seth W. Morrison* and *Theodore L. Preg,* for appellant Flightcraft.

*F. Lee Campbell* and *David D. Swartling,* for appellant Marvel–Schebler.

*Gordon Tobin,* for respondent Wagner.

*Charles Peery,* for respondent Walthers.

*Frederick Hayes,* for respondent Kalbrener.

SWANSON, J.—In these consolidated cases, Marvel–Schebler/Tillotson (Marvel–Schebler) and Flightcraft, Inc. (Flightcraft) appeal from a judgment entered on verdicts returned in favor of all plaintiffs and against both appellants totaling $3,850,000 for damages sustained in the crash of a single engine aircraft.

Plaintiffs Steve Wagner and John P. Kalbrener survived the crash and were awarded $1,300,000 and $1,800,000 respectively.[1] David R. Walthers, the pilot of the aircraft,

---

[1] Kalbrener's judgment was settled and dismissed during the pendency of this appeal. Beech Aircraft Corporation and Lycoming Engine Corporation were dismissed as defendants before trial. During the trial, Mr. and Mrs. Charles Gross and the estate of David Walthers were dismissed as defendants. The jury found

was killed in the crash. His personal representative brought a survival action and was awarded $750,000.

On this appeal, there are eight issues which we must consider. Marvel–Schebler alleges (1) that the trial court should have granted its motion for summary judgment, (2) that there was not sufficient evidence to show that the MA4SPA carburetor it manufactured was not reasonably safe, and (3) that the trial court erred in refusing to submit Marvel–Schebler's additional proposed jury instructions on product liability of a manufacturer. Flightcraft alleges (4) that the trial court erred in allowing the jury to consider Flightcraft's liability under a product liability theory because Flightcraft only acted as a repairer. Both Marvel–Schebler and Flightcraft allege (5) that the trial court allowed an incorrect measure of damages in the survival action brought by the Walthers estate, (6) that the trial court erred in refusing to admit evidence of alleged pilot error by Walthers in responding to the emergency created by engine trouble, (7) that there was no substantial evidence to allow the jury to award Wagner damages for lost future earnings, and (8) that the jury awards were excessive.

From the testimony presented during just over 2 months of trial, the jury was entitled to find that on November 19, 1975, David Walthers, John Kalbrener, and Steve Wagner were flying in a Beech Musketeer airplane owned by Gross Aviation. Walthers was working for Gross Aviation as a pilot instructor. That day he was instructing Kalbrener, a licensed pilot working for a commercial pilot rating. Wagner, a photographer friend of Kalbrener, was a passenger. Just seconds after they took off to the north from the Port Orchard Airport, the airplane experienced engine trouble. The plane had just started to turn to the left at an altitude of 200 to 400 feet when the engine stopped and never restarted. Someone in the plane immediately radioed,

Gross Aviation, Inc. was not liable. There are no appeals involving these defendants.

"Mayday! Mayday! We are landing to the south." Walthers, Kalbrener, and Wagner decided to land in a gravel pit just northwest of the runway because they felt they could reach neither the runway nor the water of Puget Sound. They also felt landing in trees near the airport would mean certain death. Walthers flew the plane toward the gravel pit where the plane crash–landed. Walthers was killed instantly on impact. Kalbrener suffered head, leg, and ankle injuries and lost an eye. Wagner received head, back, and ankle injuries.

George Seidlein of the National Transportation Safety Board and Maurice Donaldson of Beech Aircraft investigated the crash. They found the needle valve inside the plane's carburetor jammed in a closed position. At trial, Donaldson opined that the jammed needle valve blocked the fuel supply, causing the engine to stop. During the crash investigation, Donaldson and Seidlein could not find the carburetor's positive retraction clip which would have kept the needle valve open to allow fuel to reach the engine. They also found no evidence of wearing in the carburetor, indicating the positive retraction clip had not been installed. To be airworthy and safe, an aircraft carburetor must contain a positive retraction clip, required by the FAA since 1964.

The MA4SPA model carburetor on this plane was designed and manufactured by Marvel–Schebler. This carburetor was originally made in 1966 and included a positive retraction clip. Flightcraft overhauled the carburetor on May 17, 1971. Flightcraft's overhaul included the sale and installation of a Marvel–Schebler carburetor kit. Flightcraft certified the carburetor was repaired and safe for use. Gross Aviation installed the carburetor on the Beech Musketeer in May of 1973. From the time of overhaul by Flightcraft until the crash, no one had done anything to the carburetor except to install it on the airplane.

This Marvel–Schebler carburetor utilized a separate positive retraction clip which attached to connect the float lever arm to the needle valve. With this separate piece pos-

itive retraction clip design, there was no way to test a sealed carburetor to determine if the positive retraction clip was properly installed. In 1901, Marvel–Schebler designed a 1–piece integrated float lever arm including a positive retraction tab. For this unit, Marvel–Schebler developed a test to determine proper installation of the positive retraction tab. Marvel–Schebler chose to manufacture the cheaper separate positive retraction clip. It estimated the separate clip cost about $1.40 to $2.00, while redesigning and retooling for the 1–piece design would make each unit cost $6 to $14.

The plaintiffs alleged Marvel–Schebler was negligent and strictly liable for a manufacturing defect, a design defect, and/or inadequate overhaul instructions. The jury found Marvel–Schebler strictly liable but not negligent. The plaintiffs alleged Flightcraft was negligent and strictly liable for its defective carburetor overhaul. The jury found Flightcraft both negligent and strictly liable.

## SUMMARY JUDGMENT

Marvel–Schebler initially alleges that the trial court erred in failing to grant its motion for summary judgment. It primarily bases its claim of error on the failure of the plaintiff to produce expert testimony that the carburetor was not reasonably safe.

■ A trial court should grant a motion for summary judgment only if reasonable people could reach but one conclusion from all the evidence. *Lamon v. McDonnell Douglas Corp.*, 91 Wn.2d 345, 349, 588 P.2d 1346 (1979). Marvel–Schebler, the moving party, had the burden to demonstrate that there was no genuine issue as to any material fact while all reasonable inferences were resolved against the moving party. *Lamon, supra* at 349. The trial court considered all pleadings, affidavits, depositions, and admissions on file. *Barrie v. Hosts of Am., Inc.*, 94 Wn.2d 640, 642, 618 P.2d 96 (1980).

In this case despite some minor procedural irregularities by the plaintiffs, summary judgment was not warranted for

Marvel–Schebler because different inferences could be drawn from evidentiary facts to find the ultimate facts of negligence and a not reasonably safe product. *See Preston v. Duncan,* 55 Wn.2d 678, 681–82, 349 P.2d 605 (1960). After reviewing the extensive materials, we find clear inferences that Marvel–Schebler might have been negligent and produced a not reasonably safe carburetor from, among others, the depositions of the crash investigators (Seidlein and Donaldson), Flightcraft's mechanic (Chandler Larson) who overhauled the carburetor, and Marvel–Schebler's employees. Thus, the trial court did not err in denying Marvel–Schebler's motion for summary judgment.

## SUFFICIENCY OF THE EVIDENCE

Marvel–Schebler also alleges there was not sufficient evidence to show the carburetor was not reasonably safe. Thus, Marvel–Schebler asserts that the trial court erred in denying its motions for a directed verdict and for judgment notwithstanding the verdict. Again, it bases its argument on the failure of the plaintiffs to produce expert testimony which stated definitively that the carburetor was not reasonably safe.

■ Washington's test for product defect as announced in *Seattle–First Nat'l Bank v. Tabert,* 86 Wn.2d 145, 542 P.2d 774 (1975), creates a consumer–oriented standard based on the reasonable expectations of the ordinary user of a product. Under this standard, a product is not reasonably safe when that product is unsafe to an extent beyond that which an ordinary consumer would reasonably contemplate. Thus, the trier of fact in a product liability case in Washington must judge a product by the reasonable expectations of the ordinary user of that product.

■ For the present case, we agree that the jury as trier of fact needed expert testimony to understand fully the alleged design defect of the Marvel–Schebler carburetor. *See Potter v. Van Waters & Rogers, Inc.,* 19 Wn. App. 746, 757, 578 P.2d 859 (1978); *Lynd v. Rockwell Mfg. Co.,* 276 Or. 341, 349, 554 P.2d 1000 (1976). But the jury received

sufficient expert testimony to explain the workings of the carburetor and its alleged design defect through such experts as George Seidlein, Maurice Donaldson, George Wells, Donald Graham, and Robert Massey. Through such testimony, the jury considered the relevant factors about the MA4SPA model carburetor design such as the product's utility, safety aspects, available alternatives, feasibility of eliminating unsafe characteristics, feasibility of spreading potential losses, the user's ability to avoid danger, and the user's anticipated awareness of the product's inherent dangers. *Seattle–First Nat'l Bank v. Tabert, supra* at 154. *See* Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss. L.J. 825, 837–38 (1973). The expert testimony showed a feasible alternative 1–piece design which allowed for testing after assembly of the carburetor to determine if the positive retraction device were present. No such testing was available with the 2–piece design chosen by Marvel–Schebler. The users of the product were unaware of the danger where a clip was missing. The potential harm included fatal injuries. Thus, the jury received sufficient evidence to find the Marvel–Schebler design did not meet the reasonable expectations of the ordinary consumer, which is a legal standard for the jury—not for a witness—to apply. *See, e.g., Aller v. Rodgers Mach. Mfg. Co.,* 268 N.W.2d 830, 840 (Iowa 1978). Moreover, we note that a party could prevent opinion testimony on the ultimate issue of a product's not reasonably safe nature. *See* ER 704 including Comment (experts are not to state opinions of mixed fact and law such as X was negligent); *see also* 5 R. Meisenholder, Wash. Prac. § 356 (1965 & Supp. 1979).

MARVEL–SCHEBLER'S ADDITIONAL PROPOSED JURY
INSTRUCTIONS ON PRODUCT LIABILITY

■ Marvel–Schebler alleges that the trial court erred in refusing to give its proposed jury instructions that a product manufacturer is not liable for harm caused from use of a product if the product was in a safe condition when the manufacturer finished the product but subsequent con-

duct by others made the product harmful and that the mere existence of other product designs even if those designs are safer does not make a product defective so long as the design used is not unreasonably dangerous. We find, however, that the instructions given by the trial court were sufficient when read as a whole to allow Marvel–Schebler to argue its theory of the case. *See, e.g., Kjellman v. Richards,* 82 Wn.2d 766, 768, 514 P.2d 134 (1973); *Wilson v. Walla Walla,* 12 Wn. App. 152, 154, 528 P.2d 1006 (1974).

### FLIGHTCRAFT'S PRODUCT LIABILITY

Flightcraft asserts that it could not be held responsible under a product liability theory because it was only a repairer. We disagree. Initially, we must note that Flightcraft sold the Beech airplane to Gross Aviation so that it was potentially strictly liable as a seller engaged in the business of selling such a product. *Seattle–First Nat'l Bank v. Tabert,* 86 Wn.2d 145, 148–49, 542 P.2d 774 (1975). Flightcraft also sold an arguably defective Marvel–Schebler carburetor repair kit to incur strict liability. *See, e.g., Abdul–Warith v. Arthur G. McKee & Co.,* 488 F. Supp. 306, 310 (E.D. Pa. 1980).

### MEASURE OF DAMAGES IN A SURVIVAL ACTION

Marvel–Schebler and Flightcraft allege that the trial court erred by allowing an incorrect measure of damages in the survival action brought by the Walthers estate under RCW 4.20.046. The trial court allowed the economist for the Walthers estate, Dr. Peter Formuzis, to testify to two different approaches in calculating damages to the estate. Under both approaches, Dr. Formuzis used various occupational assumptions to calculate Walthers' future net earnings (reduced to present value) if Walthers had lived to his normal life expectancy. For the first approach, Dr. Formuzis determined the future net earnings to range from $96,129 to $211,016 depending on the occupational assumption. Dr. Formuzis reached these net earnings figures by subtracting from expected gross earnings the 87 percent to 90 percent consumption rate for a single indi-

vidual. However, for the second approach, Dr. Formuzis calculated the future net earnings would range from $638,784 to $1,100,000 depending on the same occupational assumptions. Over objections by Marvel–Schebler and Flightcraft, the trial court allowed Dr. Formuzis to assume Walthers was married with no children. (At the time of Walthers' death, he was in fact unmarried and had no dependents.) Then Dr. Formuzis calculated a 34 percent personal consumption rate for a married person, leaving 66 percent of gross earnings available for others, to reach his figures for future net earnings. Thus, under this second approach, the future net earnings included not only what would have remained in Walthers' estate after his normal life expectancy but also what he would have spent on others during his expected lifetime. Ultimately, the trial court instructed the jury to calculate damages for the Walthers estate with the following comment: "Personal expenses are deducted from gross earnings to reach the net earnings." Therefore, the jury could have followed Dr. Formuzis' second approach in reaching its verdict of $750,000 for Walthers' estate.

■ The Walthers estate based this action against Marvel–Schebler and Flightcraft on the Washington survival statute, RCW 4.20.046. "This statute does not create a separate claim for the survivors, but merely preserves the causes of action that a person could have maintained had he not died, other than for pain and suffering, anxiety, emotional distress, or humiliation." *Wooldridge v. Woolett*, 96 Wn.2d 659, 662–63, 638 P.2d 566 (1981). Damages in a survival action compensate the decedent's estate for the monetary losses sustained by the estate as a consequence of the decedent's untimely death. *Criscuola v. Andrews*, 82 Wn.2d 68, 507 P.2d 149 (1973) (dictum). The survival action does not allow individual members of decedent's family (or other dependents) to receive compensation for their loss due to decedent's untimely death. *See* Martin, *Measuring Damages in Survival Actions for Tortious Death*, 47 Wash. L. Rev. 609, 610–13 (1972). The survival

action compensates only the estate for what the decedent would have accumulated if the decedent had survived to life expectancy. Thus, the trial court erred here in allowing Dr. Formuzis to calculate future net earnings under his second approach to include amounts which Walthers would have spent on others during his expected lifetime. This approach, in effect, authorized recovery for expected support expenditures—damages which are recoverable in a wrongful death action.[2]

To prevent any possible confusion in measuring damages in survival actions, we conclude that the correct formulation in all survival actions is to measure future net earnings of the decedent by calculating the present value of decedent's probable future accumulations if the decedent had lived to a normal life expectancy. To perform this calculation, we must subtract all probable expenditures of the decedent (including both personal and family expenditures) from the decedent's probable gross earnings and then reduce this probable net accumulation to present value. *See Criscuola v. Andrews, supra* at 70; *Hinzman v. Palmanteer*, 81 Wn.2d 327, 332–33, 501 P.2d 1228 (1972); Martin, 47 Wash. L. Rev. at 623–28. Because the trial court here incorrectly allowed Dr. Formuzis to calculate damages under his second approach to include amounts which Walthers would have spent on others and which therefore would not have accumulated in his estate, we must reverse and remand for a new trial on damages to the Walthers estate.

---

[2]Any dependents who qualify as statutory dependents would receive compensation for their losses because of the untimely death of the decedent under the Washington wrongful death statute, RCW 4.20.010–.020. Even if no wrongful death action can be maintained, as was true here, the only recovery under a survival action should be the net accumulations of the estate. *See* Martin, *Measuring Damages in Survival Actions for Tortious Death*, 47 Wash. L. Rev. 609, 628 (1972). Recovery under the Washington survival statute does not compensate the losses suffered by the decedent's dependents. The survival statute restores to the estate only the net accumulations which the estate would have acquired if the decedent had survived to the expected lifetime.

## PILOT ERROR

Marvel–Schebler and Flightcraft next contend that the trial court erred in refusing to admit evidence of alleged pilot error in responding to the emergency caused by the engine trouble. They argue such evidence was admissible and probative on issues of causation, apportionment of damages, and comparative negligence.

■ However, we find that the trial court did admit substantial evidence on proper pilot technique when faced with engine trouble to allow Marvel–Schebler and Flightcraft to argue their theory of partial engine stoppage because of faulty spark plugs. In addition, we conclude from a consideration of the offer of proof of testimony by John Calhoun and Dr. John Tupper that the potential evidence on apportioning damages suffered by Steve Wagner was highly speculative and insufficient to be admissible. Marvel–Schebler and Flightcraft had the burden to show by a fair preponderance of the evidence, insofar as reasonably possible, which injuries were attributable to each alleged cause (engine trouble and pilot technique). *Scott v. Rainbow Ambulance Serv., Inc.,* 75 Wn.2d 494, 498, 452 P.2d 220 (1969); *Fugere v. Pierce,* 5 Wn. App. 592, 598–99, 490 P.2d 132 (1971). They did not meet this burden here. In fact, their offered testimony merely calculated different gravitational forces for a crash landing based on several assumptions. However, if the airplane had not turned to crash-land in the gravel pit, it would have had to land in trees so that the injuries attributable to the engine trouble would have also reflected, among other things, impact with those trees in addition to gravitation. Because this testimony was so speculative, the trial court did not abuse its discretion in refusing to admit it on this issue of apportioning Wagner's damages.

■ On the issue of comparative negligence, evidence of alleged pilot error was not admissible as a defense to product liability. *Seay v. Chrysler Corp.,* 93 Wn.2d 319, 609 P.2d 1382, 9 A.L.R.4th 625 (1980). Further, the evidence could not be used to show a superseding cause because the

pilot's choice of crash–landing in the gravel pit rather than in the trees was a foreseeable consequence created by the engine stoppage. *See, e.g., Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 414 N.E.2d 666, 670, 434 N.Y.S.2d 166 (1980). It was also inadmissible on a theory of assumption of risk. To prove an assumption of risk, Marvel–Schebler and Flightcraft had to show that Walthers and/or Wagner voluntarily and unreasonably proceeded to encounter a known danger. *Teagle v. Fischer & Porter Co.*, 89 Wn.2d 149, 158, 570 P.2d 438 (1977); *accord, South v. A.B. Chance Co.*, 96 Wn.2d 439, 635 P.2d 728 (1981). But Marvel–Schebler and Flightcraft never showed that anyone both discovered the defective carburetor, appreciated its danger, and nonetheless proceeded unreasonably to use the carburetor. *Boeke v. International Paint Co.*, 27 Wn. App. 611, 614–15, 620 P.2d 103 (1980).

Nevertheless, we must conclude that evidence of pilot error was admissible for Flightcraft against Walthers as a defense on the negligence cause of action. There was substantial evidence that the engine trouble occurred prior to the plane making a left turn. Steve Wagner testified at one point during trial that the plane was climbing with wings level and proceeding straight ahead when the engine trouble occurred. Odd Nordbo, who was a passenger in an airplane waiting for its turn to take off from the Port Orchard Airport, observed the plane commence its turn after he heard its radio transmission that the plane was having trouble. Even if we assume the plane had already commenced its left turn before encountering engine trouble, the defense testimony on proper pilot technique indicated that the pilot should then have immediately lowered the nose and leveled the wings to maintain air speed because of a complete engine stoppage. The pilot should have made gradual turns but not a steep turn as observed by Wesley Neill and Odd Nordbo. In light of this substantial evidence, Walthers could not invoke the emergency doctrine because of his possible negligent operation of the plane. *See Curtis v. Blacklaw*, 66 Wn.2d 484, 492, 403 P.2d 358 (1965). The

admissibility of alleged pilot error is bolstered also by Steve Wagner's testimony that he, Walthers, and Kalbrener considered a landing in the trees to mean certain death so that they chose to land in the gravel pit. Other evidence offered indicated that a landing in the trees would have substantially reduced the impact and minimized damages.

### FUTURE WAGE LOSSES FOR WAGNER

Marvel–Schebler and Flightcraft allege that there was no substantial evidence as to Wagner's lost future earnings. However, the evidence at trial clearly showed that Wagner suffered a loss of memory. That evidence showed he cannot concentrate and becomes irritable and frustrated. Because of his difficulty with spatial recognition, back problems, and impairment of his olfaction, taste, and vision, he will not be able to perform his chosen occupation of photographer as well as before. Thus, we find substantial evidence to support the jury instruction on Wagner's future wage losses.

### EXCESSIVE JURY AWARDS

Marvel–Schebler and Flightcraft contend the jury awards were excessive. However, we do not find the jury award for Wagner was so large as to shock our sense of justice and sound judgment. We conclude the trial court did not abuse its sound discretion in upholding the jury's determination of damages for Wagner. *Lundgren v. Whitney's Inc.*, 94 Wn.2d 91, 614 P.2d 1272 (1980); *Newcomer v. Weyerhaeuser Co.*, 26 Wn. App. 958, 964, 614 P.2d 705 (1980).

### CONCLUSION

To recapitulate, we conclude that the trial court did not err in Steve Wagner's case. We affirm the jury's verdict for Wagner.

As to the Walthers estate claim, we conclude the trial court allowed an incorrect formulation of damages for a survival action.[3] We therefore reverse and remand for a

---

[3]Because of our disposition of this issue, we need not address the alleged errors in closing argument by counsel for the Walthers estate.

new trial limited to damages for Walthers' estate. Even though the trial court should have admitted the proffered evidence of alleged pilot error in the Walthers estate negligence action against Flightcraft, such error is not reversible in that Flightcraft's liability was established on the additional basis of strict product liability. Therefore, we affirm the findings by the jury that Marvel–Schebler and Flightcraft are liable to the Walthers estate under the theory of product liability. Each party on Walthers' estate's appeal will bear its own costs.

CALLOW and CORBETT, JJ., concur.

Reconsideration denied May 26, 1982.

Review denied by Supreme Court October 8, 1982.