[No. 33445-0-I.    Division One.    January 17, 1995.]

JOHN BRUNS, ET AL, *Appellants*, v. PACCAR, INC.,
*Respondent*.

*Albert Johnson* and *Davies Roberts Reid & Wacker,* for appellants.

*Mark Johnsen* and *Karr Tuttle Campbell,* for respondent.

COLEMAN, J. — John Bruns and 23 other truck drivers (Drivers) appeal the trial court's order granting summary judgment in favor of PACCAR in a design defect products liability case. Appellants assert the trial court erroneously granted summary judgment because they presented genuine issues of material fact as to the existence of a design defect and as to causation. We reverse.

Dallas-Mavis & Company employs truck drivers to transport trucks manufactured by Kenworth Trucking, a division of PACCAR, Inc., to purchasers throughout North America. Kenworth inspects and test drives completed trucks for less than an hour as they exit the assembly line. The vehicles are then delivered to the Dallas-Mavis garage, where drivers receive delivery assignments. Depending on the destination, drivers spend varying lengths of time in the trucks during delivery. In 1989, the Drivers began to complain of health problems that arose during and after driving the trucks. These problems included skin rashes, respiratory symptoms, nosebleeds, tight chests, numb fingers, headaches, and fatigue. At the request of PACCAR and the Drivers, several air quality consultants investigated the situation. These consultants could not pinpoint a specific chemical agent as the cause of the harm.

In October 1990, 13 Drivers filed a products liability claim against PACCAR. The Drivers maintained they were injured by chemicals present in newly manufactured Kenworth truck cabs. In March 1992, an additional 11 Drivers filed a similar suit against PACCAR. The two suits were consolidated. PACCAR moved for summary judgment on the ground that the Drivers had not presented proof that their injuries resulted from exposure to toxic chemicals in PACCAR's trucks. PACCAR framed the Drivers' lack of proof as (1) failure to identify chemicals in the trucks approaching threshold limit values (TLV)[1] and (2) a no "more probable than not" causation link. In opposition to the motion for summary judgment, the Drivers offered deposition testimony of three expert witnesses and an unsworn report by another expert witness.

The Drivers first presented the deposition testimony of Richard Knights, Ph.D., a chemical analyst, who had conducted air sample testing in Kenworth truck cabs. His expertise lay in identifying the worst or most abundant chemicals in the air and their source. He had tested the trucks for chemicals that offgas from new products, like molded plastics. Dr. Knights identified many airborne chemicals in the truck cabs; each of these chemicals registered at levels lower than those identified in regulatory standards as dangerous. Dr. Knights explained that he had no background in medicine or toxicology and was not qualified to offer an opinion as to the cause of the Drivers' medical conditions. Further, he had no opinion on a more probable than not basis as to the likely source or cause of the Drivers' ailments.

The Drivers then submitted the deposition testimony of Patricia Sparks, M.D., an occupational medical specialist in chemical exposure and epidemiology. Dr. Sparks had conducted clinical examinations and reviewed the medical

---

[1]Threshold limit values are established by the American Conference of Governmental Industrial Hygienists and indicate the airborne concentrations of chemicals that are believed safe for workers to be exposed to on a daily basis. Another index is permissible exposure level (PEL) established by the United States Department of Labor, Occupational Safety and Health Administration. Acceptable PEL's are often higher than TLV's.

records of 22 drivers who had filed workers' compensation claims. Although she found symptoms most prominent in new trucks on outbound trips of several days in the winter with the heater on, she found no indication of systemic toxicity and could not identify one specific exposure to account for the Drivers' symptoms. Instead, she stated that there was "probably a multifactorial explanation for the symptoms", including low humidity in the cabs. In a declaration, Dr. Sparks summarized her reports on the individual Drivers as "set-[ting] forth a list of diagnoses . . . for the conditions which was [sic] caused by an unspecified irritant, airborne or direct contact, while driving newly-manufactured Kenworth trucks on a more probable than not basis".

In her deposition testimony, Dr. Sparks affirmed the possibility that low levels or combinations of chemicals could produce low level irritation or sensory irritation. She emphasized that no TLV's exist for skin irritation and that "[t]here are certainly case reports of skin irritation produced by airborne irritant exposure and the exposures are not necessarily always above the permissible exposure limit, which is often set on the basis of some other health effect." However, she believed the exposures detected "were unlikely to produce direct irritant effects or systemic toxicity". Dr. Sparks was not aware of any epidemiological studies conducted specifically to assess the relation between time spent in truck cabs and the type of injury alleged by the Drivers.

The Drivers next offered the deposition testimony of William Daniell, M.D., an occupational medical specialist in chemical exposure. Dr. Daniell had evaluated seven Drivers who made upper respiratory and skin rash complaints. He noted a temporal association between the symptoms and work activities and reported that some of these symptoms appeared consistent with irritation by some unidentified airborne chemical substance. Dr. Daniell was unable to identify one specific chemical or group of chemicals as the cause, and he was unaware of any studies in this specific area. In one Driver's examination record, Dr. Daniell concluded that

> [b]ased on all available information I am compelled to state on a more probable than not basis that Mr. Cook's recurrent der-

matitis is somehow related to a yet-unidentified workplace factor. I can make no determination as to whether that factor is single or multiple, involves a specific chemical or chemicals, involves nonspecific chemical irritation, involves nonchemical irritation, involves group or individual factors or whatever.

Dr. Daniell stated that this opinion was true for all Drivers he had examined and that he had insufficient information to sort out among the possible explanations.

Dr. Daniell testified that, although a low probability, it would not be impossible for low levels (less than 10 percent of TLV) of a mix of several chemicals to cause the Drivers' dermatitis. He stated:

We see that quite often in mixed chemical low level exposures, that repeated sampling shows levels which are way below applicable standards and that there are still symptoms which can be improved by interventions intended to reduce or eliminate those low level exposures.

He also identified several other possible causes. He stated that sociogenic factors were likely "significant contributing factors", and that some symptoms might be either unrelated to chemical exposure at work or merely aggravated by a nonspecific work factor.

Dr. Daniell concluded in his deposition testimony that he had not heard any explanatory or causative factors that he felt could account on a more probable than not basis for the Drivers' symptoms. In an explanatory declaration, he clarified that deposition testimony by stating:

[I]t is more probable than not that the cluster of symptoms exhibited by the plaintiffs is related to their time spent in the truck cabs of newly manufactured Kenworth trucks during the course of delivery of those truck cabs. Further, that a variety of possible causes for the cluster of symptoms have been offered, including low humidity, no smoking in the truck cabs, psychosomatic factors and airborne particulates and airborne chemical particulates. Among these proposed explanations for the cluster of symptoms, it is my opinion that the most probable explanation for the cluster of symptoms is airborne chemical particulates, with or without the other possible explanations interacting.

In a portion of his deposition testimony that he did not seek to clarify, Dr. Daniell stated that all suggested causes seemed

to be a low probability, "[s]o in that sense [airborne chemicals are] no less probable than anything else anybody's put forward".

The Drivers submitted a report prepared by Charles McCammon, Ph.D., an investigator and chemical consultant for the National Institute of Occupational Safety and Health (NIOSH). Dr. McCammon had reviewed records and reports conducted by the various consultants, distributed Driver questionnaires, taken air samples from truck cabs, and conducted an onsite inspection at Kenworth's manufacturing plant. He identified over 100 organic compounds in small quantities and found hydrocarbon, carbon monoxide, aldehydes, fiberglass, isocyanates, and xylene in concentrations at less than 10 percent of their TLV and PEL. Dr. McCammon found two known skin irritants in measurable quantities, but his report stated that "the levels were so low that it was unlikely that they were responsible for the widespread skin problems." However, he added that

> not all workers will be protected from adverse health effects if their exposures are maintained below [TLV or PEL]. A small percentage may experience adverse health effects because of individual susceptibility, a preexisting medical condition, and/or a hypersensitivity (allergy).
>
> In addition, some hazardous substances may act in combination with other workplace exposures, the general environment, or with medications or personal habits of the worker to produce health effects even if the occupational exposures are controlled at the level set by the evaluation criterion. These combined effects often are not considered in the evaluation criteria. Also, some substances are absorbed by direct contact with the skin and mucous membranes and, thus, potentially increase the overall exposure. Finally, evaluation criteria may change over the years as new information on the toxic effects of an agent becomes available.

Dr. McCammon concluded, "No single contaminant or set of conditions was identified to explain the truck drivers' health complaints." Instead, he found the temporal patterns reported by Drivers consistent with a work-related etiology. His summary stated, "The symptoms experienced by DMFC employees appear related to the driving of new KW trucks." Based on the high level of hydrocarbons found in trucks and

the perceived temporal relationship, Dr. McCammon recommended natural offgassing or a "bake-out" of the trucks before delivery to the Dallas-Mavis garage.

The trial judge reviewed this expert testimony and granted summary judgment in favor of PACCAR without stating specific grounds.

## STANDARD OF REVIEW

An appellate court will review an order of summary judgment by conducting the same inquiry as the trial court, considering all facts submitted and making all reasonable inferences from those facts in the light most favorable to the nonmoving party. *Young v. Key Pharmaceuticals, Inc.*, 112 Wn.2d 216, 226, 770 P.2d 182 (1989). To grant a motion of summary judgment properly, the facts must demonstrate that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law. CR 56(c). The moving party bears the burden of showing the absence of an issue of material fact. When the moving party is a defendant who meets this initial showing, the plaintiff must make a prima facie case of all essential elements. A plaintiff establishes a prima facie case when the evidence supports a reasonable inference of each element. *Pelton v. Tri State Mem. Hosp., Inc.*, 66 Wn. App. 350, 354, 831 P.2d 1147 (1992).

Drivers assert a design defect products liability claim under RCW 7.72.030. Under that statute, the elements of a design defect products liability claim are (1) a manufacturer's product (2) that was not reasonably safe as designed (3) caused harm to the plaintiff. RCW 7.72.030(1). To establish a prima facie case under the statute, plaintiff must offer admissible evidence showing each of these elements. *Cf. Padron v. Goodyear Tire & Rubber Co.*, 34 Wn. App. 473, 476, 662 P.2d 67, *review denied*, 100 Wn.2d 1003 (1983). PACCAR asserted in its motion for summary judgment that the Drivers failed to establish elements 2 and 3.

Initially, we determine whether the Drivers showed that the trucks were not reasonably safe as designed when they

failed to identify a specific chemical as the product's defect. To establish a design defect products liability claim a plaintiff must show that the product was not reasonably safe as designed. RCW 7.72.030(1)(a). A plaintiff may demonstrate this by using either a risk-utility analysis or a consumer expectation standard. *See Falk v. Keene Corp.*, 113 Wn.2d 645, 649-50, 782 P.2d 974 (1989) (interpreting RCW 7.72.030(1)(a) and (3)). Under a risk-utility analysis, a plaintiff must show that, at the time of manufacture, the likelihood and seriousness of harm caused by the product outweighed the manufacturer's cost and opportunity to design a product that would not have caused that harm. RCW 7.72.030(1)(a). Alternatively, the plaintiff may establish manufacturer liability by showing the product was unsafe as contemplated by a reasonable consumer. RCW 7.72.030(3). Several factors contribute to this consumer expectation determination, including "[t]he relative cost of the product, the gravity of the potential harm from the claimed defect and the cost and feasibility of eliminating or minimizing the risk[.]" *Seattle-First Nat'l Bank v. Tabert*, 86 Wn.2d 145, 154, 542 P.2d 774 (1975).

The Drivers argue that they established a design defect under both the risk-utility and the consumer expectation tests. They alleged that their injuries were caused by airborne particulates from several chemical compounds that had been offgassed from the interior of the truck cabs. They offered expert testimony that identified several chemicals in the truck cabs and the levels at which those chemicals were present.

PACCAR asserts that the Drivers failed to present evidence of a design defect because they did not (1) identify a specific chemical or truck component as the defect, (2) show any chemicals present in amounts approaching TLV or PEL limits, or (3) offer any competent proof that offgassing constitutes a dangerous condition. The parties agree that no specific chemical emerged as the source of injury and that chemicals present in the truck cabs registered in quantities much lower than required by regulations. PACCAR contends

this would cause the jury to engage in pure speculation when undertaking the consumer expectation or risk-utility analysis.

The Drivers argue that neither the risk-utility nor the consumer expectation test requires proof of a specific chemical as the design defect. We agree. A plaintiff need not prove defectiveness separately from unreasonable danger-ousness. Although PACCAR correctly asserts that RCW 7.72.030 does not encompass liability merely because a prod-uct causes harm, *see Tabert*, at 150, a manufacturer is held strictly liable when a product that is not reasonably safe causes harm because a product is statutorily defective when it is unreasonably dangerous. *Falk*, at 649 (quoting *Tabert*, at 154). The statute provides factors to consider under the risk-utility analysis, and case law supplies factors for the consumer expectation standard. Neither authority expressly requires proof of a specific chemical compound as the defect in a toxic tort claim.

PACCAR correctly posits that *Wagner v. Flightcraft, Inc.*, 31 Wn. App. 558, 643 P.2d 906, *review denied*, 97 Wn.2d 1037 (1982) requires reliable and specific expert testimony to es-tablish the nature of the alleged dangerous condition in a products liability case. In *Wagner*, the court found that the jury needed expert testimony to understand fully the alleged design defect in an airplane carburetor. In the present case, Dr. Knights offered competent and specific expert testimony regarding the presence of several airborne chemicals and organic compounds, and Drs. Knight and McCammon identi-fied available alternatives.

PACCAR argues that the Drivers must provide specific ev-idence of a product defect to survive summary judgment, under *Charbonneau v. Wilbur Ellis Co.*, 9 Wn. App. 474, 512 P.2d 1126 (1973). That case addressed whether or not an ag-ricultural oil spray was defective. Plaintiff Charbonneau testified, as an expert, that the oil was defective but also admitted that the oil could cause damage whether or not it was defective. Wilbur Ellis argued that Charbonneau could not demonstrate that the damage resulted from a defect in

the oil instead of from misapplication of the oil. The court upheld the summary judgment in favor of Wilbur Ellis, deciding that, without any evidence as to a defect in the oil spray other than plaintiff's testimony, a jury could only speculate as to whether the oil was defective instead of misapplied. *Charbonneau*, at 477.

The issue before the court in *Charbonneau* differed from the current case. The Drivers do not concede that the truck cabs could have caused their injuries whether or not the cabs were defective; instead they seek to show that the trucks were not reasonably safe and that their injuries would not have otherwise occurred. *Charbonneau* also differs from the current case because it was decided before the Legislature enacted the products liability statute and it did not utilize an analytical framework similar to the one provided in the current statute.

Wagner and *Charbonneau* do not stand for the proposition that expert testimony must identify one specific chemical agent as the product defect in a toxic tort case, as PACCAR contends. In fact, PACCAR cites no cases that require a plaintiff to identify one specific chemical, chemicals exceeding certain levels, or one component of a product as the defect or source of unreasonable danger.[2] In contrast, Drivers submit several cases that have declined to require plaintiffs to identify a specific chemical in toxic tort cases.

A recent opinion by this court found the plaintiffs' evidence in a toxic tort case sufficient without proof of a specific chemical cause. *Intalco Aluminum Corp. v. Department of Labor & Indus.*, 66 Wn. App. 644, 833 P.2d 390 (1992), *review denied*, 120 Wn.2d 1031 (1993). *Intalco* addressed claims under the workers' compensation statutes. Under those statutes, a plaintiff must show evidence of an occupational disease arising proximately out of distinctive employ-

---

[2]PACCAR asserts that expert testimony is required when the identity and characteristics of chemical substances is at issue, under *State v. Hink*, 6 Wn. App. 374, 492 P.2d 1053, *review denied*, 80 Wn.2d 1007 (1972). *Hink* addressed criminal possession of LSD and an officer's ability to correctly identify a substance as LSD. That case provides no guidance for the present case.

ment conditions. *Intalco*, at 654. The plaintiffs in that case alleged they were injured as a result of exposure to air pollution in an aluminum production plant where they worked. Neither party in that case named one chemical agent as the source of the disease, although one expert witness identified several toxins, some of which had been associated with the type of disease the plaintiffs alleged. *Intalco*, at 655. Instead, the experts testified that an unspecified toxin or a combination of toxins constituted the employment condition that proximately caused the plaintiffs' disease. *Intalco*, at 655.

Intalco claimed that this medical testimony was insufficient because the physicians could not identify the specific toxic agent or agents that caused the claimants' disease. *Intalco*, at 655. The court noted the Legislature's mandate to construe workers' compensation provisions liberally in favor of the worker seeking compensation and then declined to read into the statute a requirement that the plaintiff identify the specific toxic agent responsible for his disease. *Intalco*, at 656. The court's analysis in that case informs the analysis in the present case.[3]

PACCAR contends *Intalco* is inapposite because the workers' compensation standard of showing a workplace condition is easier to meet than the design defect or unreasonable dangerousness standard. We decline to distinguish *Intalco* on this point. The court in *Intalco* reviewed two out-of-state cases that refused to require proof of a specific chemical in toxic tort products liability cases. *Intalco*, at 656-58 (citing *Earl v. Cryovac*, 115 Idaho 1087, 772 P.2d 725 (Ct. App. 1989) and *In re Robinson*, 78 Or. App. 581, 717 P.2d 1202 (1986)). The court in *Earl* stated:

---

[3]PACCAR's attempt to distinguish *Intalco* is not convincing. PACCAR asserts that the experts in *Intalco* identified aluminum, fluoride, and benzene solubles as the specific chemical culprits. PACCAR also finds significant that one of those chemicals was found in levels exceeding the TLV. Although the NIOSH expert in that case tested for fluoride, he did not measure aluminum or benzene. Instead of relying on tests, he offered his opinion that those toxins would likely be present. *Intalco*, at 649. Thus, PACCAR overstates the certainty with which the experts in *Intalco* identified specific chemical agents. The court in that case did not indicate that they considered the TLV a threshold standard.

> We do not consider it fatal to the plaintiff's case that the etiology of his disease has not been traced to a discrete component or set of components within the heated plastic vapor. . . . [T]he plaintiff need only show that the product is unsafe; he need not identify and prove the specific defects which render it unsafe. The same approach is reflected in the cases . . . where victims of "meatwrapper's asthma" have been allowed to recover despite scientific uncertainty as to the precise etiological link between their disease and specific chemical(s) in the heated plastic vapors.

*Earl*, at 1095, *quoted in Intalco*, at 657.

In *Robinson*, the plaintiff alleged under workers' compensation statutes that exposure to high concentrations of chemicals "gassed out" from furniture caused her to experience an increased sensitivity to certain chemicals. The court considered whether workplace conditions had caused the plaintiff's disease. Although the court in *Robinson* did not explicitly address whether or not one chemical source must be identified, the court's consideration of gassed-out chemicals as the source of injury demonstrates that chemical off-gassing is not a "phantom defect conjured up by counsel", as PACCAR asserts.

Thus, the Drivers do not need to identify a specific chemical to show a design defect in this toxic tort products liability case.

> When it is shown that a product failed to meet the reasonable expectations of the user the inference is that there was some sort of defect, a precise definition of which is unnecessary. If the product failed under conditions concerning which an average consumer of that product could have fairly definite expectations, then the jury would have a basis for making an informed judgment upon the existence of a defect.

*Potter v. Van Waters & Rogers, Inc.*, 19 Wn. App. 746, 755-56, 578 P.2d 859 (1978) (quoting *Bombardi v. Pochel's Appliance & TV Co.*, 10 Wn. App. 243, 246-47, 518 P.2d 202 (1973), *review denied*, 83 Wn.2d 1009 (1974)). Here, the Drivers point to a "chemical soup" as the defect. They provide a list of chemicals found in the truck cabs and the concentrations at which they were found. Therefore, we find that the Drivers offered sufficient evidence to allow a reasonable person to find the trucks not reasonably safe.

■ Finally, we determine whether the Drivers' expert testimony established that the alleged defect proximately caused their injuries. To establish a prima facie case of design defect product liability, the Drivers must show that the alleged defect or unsafe condition proximately caused their injuries. RCW 7.72.030(1). Proximate cause consists of two elements — factual or "but for" causation and legal causation. Factual causation exists when the injury would not have occurred but for the defendant's act; this requires a physical connection between an act and an injury. Legal causation rests on policy considerations as to how far the legal consequences of a defendant's act should extend. *Anderson v. Dreis & Krump Mfg. Corp.*, 48 Wn. App. 432, 441-42, 739 P.2d 1177, *review denied*, 109 Wn.2d 1006 (1987).

■ Factual causation is generally a question for the fact-finder. However, "when the facts are undisputed and the inferences therefrom are plain and incapable of reasonable doubt or difference of opinion, factual causation may become a question of law for the court." (Footnote omitted.) *Baughn v. Honda Motor Co.*, 107 Wn.2d 127, 142, 727 P.2d 655 (1986). PACCAR contends that the Drivers failed to establish cause in fact as a matter of law because they failed to present expert testimony that established a more probable than not connection between the Drivers' injuries and the alleged defect.

■ PACCAR asserts that the Drivers must establish causation with expert medical testimony because the claimed causal connection is beyond the understanding of a layperson. Whether or not causation must be shown with expert testimony depends on the nature of the injury. Expert testimony is required to establish causation when an injury involves obscure medical factors that would require an ordinary layperson to speculate or conjecture in making a finding. *Riggins v. Bechtel Power Corp.*, 44 Wn. App. 244, 254, 722 P.2d 819, *review denied*, 107 Wn.2d 1003 (1986). *See also O'Donoghue v. Riggs*, 73 Wn.2d 814, 824, 440 P.2d 823 (1968). In the present case, the Drivers' claim that multiple airborne chemicals caused them to experience various physi-

cal reactions is medically complex. This type of toxic reaction lies beyond ordinary lay knowledge and requires expert medical testimony to demonstrate a causal link.

■ This required expert testimony must provide proof that the defect "more probably than not" caused the Drivers' injuries. Less certain evidence, such as may, might, could or possibly, does not provide enough guidance to the jury to remove the decision-making process from speculation and conjecture. *O'Donoghue*, at 824; *Miller v. Staton*, 58 Wn.2d 879, 886, 365 P.2d 333 (1961). Although this more probable than not standard does not require absolute certainty,

> *if the evidence shows* that the injury is equally or else with reasonable certainty attributable to other probable causes, [the plaintiff] must also exclude other causes. *But in so doing he is not compelled to meet conjecture or mere possibilities with proof to the contrary.*

*Potter*, at 752 (quoting *Kuster v. Gould Nat'l Batteries*, 71 Wn.2d 474, 485, 429 P.2d 220 (1967)). The Drivers contend that they offered competent expert testimony to establish that offgassed chemicals more probably than not caused the specified injuries. The Drivers offered three qualified experts on the issue of causation, Drs. Daniell, Sparks, and McCammon.[4]

■ PACCAR argues that the Drivers' experts do not present competent testimony under *Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923) because they do not rely on any human epidemiological studies or animal studies. The Drivers argue that the expert testimony they presented is competent under ER 703 and *Frye*. ER 703 requires the facts and data relied on by expert witnesses to be of a type reasonably relied upon by experts in the field. A *Frye* inquiry addresses novel scientific methodology; it does not deal with medical opinion based on established scientific technique. *See State v. Cauthron*, 120 Wn.2d 879, 886-90, 846 P.2d 502 (1993) (discussing *Frye*). *See also Intalco Aluminum Corp. v. Department of Labor & Indus.*, 66 Wn. App. 644, 661-62, 833

---

[4]As he acknowledged, Dr. Knights is not a medical expert and is not qualified to offer an opinion on causation.

P.2d 390 (1992), *review denied*, 120 Wn.2d 1031 (1993). Here, the experts relied on air sampling, chemical analysis, clinical examinations, and questionnaires. These qualify as established scientific methods of the type relied upon by experts in the field, not novel scientific theories. Thus, we need not engage in a *Frye* analysis.

In addition, the court in *Intalco* noted that

> [t]he absence of studies linking aluminum plant pot room exposure to neurologic disease does not compel the conclusion that the claimants failed to make a showing of proximate cause. [One NIOSH expert] acknowledged that every year the medical profession discovers that "new" diseases, which were previously thought to have unknown or non-work-related causes, are in fact occupationally related. Further, [one medical expert] testified that the lack of reported cases of neurologic disease among aluminum plant workers does not mean that they do not exist. She noted that there are many examples in occupational medicine where an association between a patient's work conditions and disease has gone unnoticed for years, often because the patient's illness has been misdiagnosed. If this court were to accept Intalco's argument, the first victims of any newly recognized occupational disease would always go uncompensated.

*Intalco*, at 660. *See also Ferebee v. Chevron Chem. Co.*, 736 F.2d 1529, 1535-36 (D.C. Cir), *cert. denied*, 469 U.S. 1062 (1984), *quoted in Intalco*, at 661. While studies would strengthen an expert's testimony on causation, the competence of expert testimony does not depend on the existence of such studies.

For this reason, the issue is whether or not the Drivers' experts offered the "more probable than not" opinions necessary to avoid summary judgment in favor of PACCAR. The cases presented by the Drivers support the argument that their experts stated the causal connection with the requisite legal certainty. In *Earl v. Cryovac*, 115 Idaho 1087, 772 P.2d 725 (Ct. App. 1989), the primary treating physician found a "high probability" that the plaintiff's pulmonary disease was caused by a plastic film used in the meat-packing room, and an industrial hygienist testified that a cause and effect relationship existed with "reasonable scientific certainty". *Earl*, at 1091-93. In *Intalco*, two doctors "firmly concluded" that a

toxin or combination of toxins found in the workplace more probably than not caused the plaintiffs' neurologic disease. *Intalco,* at 655. This conclusion was based in part on the doctors finding no other likely causes after extensively investigating the plaintiffs' medical and work histories. *Intalco,* at 656.

The expert testimony offered by the Drivers similarly provides the required level of legal certainty. The Drivers' experts presented more than several equally probable or possible causes, *cf. O'Donoghue,* at 824 (expert offered three possible causes; jury had to speculate as to actual cause), or merely generalized statements. *Cf. Miller,* at 886 (expert did not relate general condition to specific plaintiff). Moreover, while they did not rule out interaction with other factors, the experts did not attribute the Drivers' symptoms to other probable causes "with reasonable certainty". *Cf. Potter v. Van Waters & Rogers, Inc.,* 19 Wn. App. 746, 752, 578 P.2d 859 (1978).

Although she allowed for a multifactorial explanation, Dr. Sparks reported that "the conditions . . . [were] caused by an unspecified irritant . . . while driving newly-manufactured Kenworth trucks on a more probable than not basis." Dr. Daniell similarly stated that time spent in Kenworth trucks more probably than not caused the Drivers' injuries. Although he identified several possibilities within the truck cabs, he stated that airborne chemicals were the most probable. The least conclusive of the experts, Dr. McCammon, concluded that the symptoms "appear[ed] related to the driving of new KW trucks".

We find that these experts provided sufficient proof that the alleged defects more probably than not caused the Drivers' injuries and that, therefore, a jury would not have to resort to speculation in order to find proximate cause. Thus, the Drivers made a prima facie showing as to the third element necessary to establish a design defects products liability claim.

For the reasons stated, the trial court improperly granted summary judgment in favor of PACCAR.

The order of summary judgment is reversed.

PEKELIS, C.J., concurs.

SCHOLFIELD, J.* (dissenting) — Appellants claim they presented genuine issues of material fact as to the existence of a design defect and as to causation. The majority opinion agrees and reverses the summary judgment granted PACCAR by the trial court. I dissent on the ground that the evidence presented by the Plaintiffs (Drivers) is insufficient to sustain a finding of a design defect.

As reflected in the majority opinion, air quality consultants were employed by PACCAR and the Drivers. Those consultants could not identify any chemical or group of chemicals or any other source as the probable cause of the Drivers' physical complaints. The consultants theorized about various possibilities, including low humidity, but none could identify a cause on a more probable than not basis. Despite this failure to identify a cause of the Drivers' physical problems, the majority opinion holds that the Drivers' evidence is sufficient to raise substantial issues of material fact on the issues of a product defect and causation.

The experts seem to recognize some degree of a temporal relationship between the physical problems experienced by the Drivers and driving the trucks over long distances, particularly under conditions when the cab is closed and the air heaters are in operation. It is my view that proving no more than some degree of temporal relationship is insufficient to support a finding that a product is defective under the products liability laws of this state.

Dr. Patricia Sparks found no indication of systemic toxicity and, as accurately reported in the majority opinion at page 205, she believed that the exposures detected "were unlikely to produce direct irritant effects or systemic toxicity". The deposition testimony of Dr. William Daniell, an occupational

---

*This opinion was filed after the retirement of Judge Jack P. Scholfield, but it was written by Judge Scholfield prior to his retirement.

medical specialist in chemical exposure, noted the temporal relationship between the symptoms and work activities and was of the view that the symptoms appeared consistent with irritation by some unidentified airborne chemical substance. In this respect, however, he stated that the temporal association was "suggestive of some possible causative relationship, but the nature of this relationship remains completely unclear." Dr. Daniell went on to say in respect to the yet-unidentified workplace factor that "I can make no determination as to whether that factor is single or multiple, involves a specific chemical or chemicals, involves nonspecific chemical irritation, involves nonchemical irritation, involves group or individual factors or whatever."

In the report of Charles McCammon, Ph.D., submitted by the Drivers, he found two known skin irritants in measurable quantities, but stated that "the levels were so low that it was unlikely that they were responsible for the widespread skin problems". As noted in the majority opinion, he was also of the view that the symptoms experienced by the Drivers appeared to be related to the driving of new Kenworth trucks. He suggested that accelerating offgassing by baking out the trucks before delivery to the drivers was a possible solution to the problem.

> The doctrine of strict liability does not impose legal responsibility simply because a product causes harm. Such a result would embody absolute liability which is not the import of strict liability.

*Seattle-First Nat'l Bank v. Tabert,* 86 Wn.2d 145, 150, 542 P.2d 774 (1975).

> Thus, we hold that liability is imposed under section 402A if a product is not reasonably safe. This means that it must be unsafe to an extent beyond that which would be reasonably contemplated by the ordinary consumer. This evaluation of the product in terms of the reasonable expectations of the ordinary consumer allows the trier of the fact to take into account the intrinsic nature of the product. The purchaser of a Volkswagen cannot reasonably expect the same degree of safety as would the buyer of the much more expensive Cadillac. It must be borne in mind that we are dealing with a relative, not an absolute concept.

In determining the reasonable expectations of the ordinary consumer, a number of factors must be considered. The relative cost of the product, the gravity of the potential harm from the claimed defect and the cost and feasibility of eliminating or minimizing the risk may be relevant in a particular case. In other instances the nature of the product or the nature of the claimed defect may make other factors relevant to the issue.

*Tabert*, at 154.

The instruction recommended in WPI 110.02 involving a manufacturer's duty of safe design includes the elements referred to in *Tabert*, including "the cost and feasibility of eliminating or minimizing the risk". It is the requirement that the product be shown to be not reasonably safe for reasons attributable to the design of the product which distinguishes strict liability under our products liability laws from absolute liability. The evidence presented to the trial court by the Drivers in this case went no further than to show a possible relationship between the design of the truck and symptoms experienced by the Drivers. Presenting evidence of a likely temporal relationship, without more, is insufficient.

The majority opinion acknowledges that *Wagner v. Flightcraft, Inc.*, 31 Wn. App. 558, 643 P.2d 906, *review denied*, 97 Wn.2d 1037 (1982) requires reliable and specific expert testimony to establish the nature of the alleged dangerous condition in a products liability case. The majority opinion's suggestion that Dr. Knights' testimony met this requirement is unpersuasive. Dr. Knights went no further than to identify airborne chemicals in the truck cabs, each of which registered at levels lower than those identified in regulatory standards as dangerous. Dr. Knights acknowledged that he had no background in medicine or toxicology and was not qualified to offer an opinion as to the cause of the Drivers' medical conditions. He acknowledged that he had no opinion on a more probable than not basis as to the likely source or cause of the Drivers' ailments. This testimony falls far short of testimony that could provide reliable guidance to a jury in resolving issues of causation and the reasonable safety of the

product. None of the experts referred to in the majority opinion were willing to speculate on the identity of the cause of the Drivers' ailments. Where the experts are unwilling to speculate on the critical issues, a jury should not be allowed to speculate either.

The flaw in the majority's reasoning in this case is demonstrated by its reliance on *Intalco Aluminum Corp. v. Department of Labor & Indus.*, 66 Wn. App. 644, 833 P.2d 390 (1992), *review denied*, 120 Wn.2d 1031 (1993). *Intalco* involved claims under the workers' compensation statutes. It is not a product liability case. The goal of the Industrial Insurance Act is to provide compensation to all covered workers injured in the course of their employment. The act is liberally construed with all doubts resolved in favor of the worker. As *Intalco* demonstrates, the proof need go no further than to demonstrate a causal relationship between the worker's illness and conditions encountered in his workplace. If proof sufficient to justify compensation under the Industrial Insurance Act is deemed sufficient to prove a defective product in a products liability case, then proof that the product is defective will have been eliminated. The proof submitted by the Drivers in this case could very well be adequate to support an award of compensation under the Industrial Insurance Act because to show the causal relationship under that act does not require precise identification of air pollutants causing the injury.

The majority opinion does not explain how a jury could assess the cost and feasibility of eliminating or minimizing the risk when there is no evidence before the jury identifying the risk, its source, and the cost and feasibility of eliminating it.

For these reasons, I would affirm the trial court.

Review denied at 126 Wn.2d 1025 (1995).