[No. 7383–1–III.   Division Three.   July 1, 1986.]

ELIZABETH A. RIGGINS, *Respondent,* v. BECHTEL
POWER CORPORATION, *Appellant,* J. A. JONES
CONSTRUCTION COMPANY, *Respondent.*

*Philip A. Talmadge, Steven V. Lundgren,* and *Karr, Tuttle, Koch, Campbell, Mawer & Morrow,* for appellant.

*Hugh O. Evans* and *Evans, Craven & Lackie,* for respondent Riggins.

*Douglas W. Purcell, Lynne A. Chafetz,* and *Davis, Wright, Todd, Riese & Jones,* for respondent J. A. Jones Construction Co.

McINTURFF, J.—Bechtel Power Corporation appeals an award to Elizabeth Riggins for damages sustained when she tripped and fell over a piece of rebar while working on the construction site of Hanford Plant 1 of the Washington Public Power Supply System (WPPSS). The basic issues Bechtel raises are whether it, as a consultant engineering firm, owed Ms. Riggins, an employee of Jones Construction

Co. (Jones), a duty to provide a safe place to work and whether Jones agreed to indemnify Bechtel for judgments obtained by its employees against it. We affirm in part and reverse in part, remanding this case for retrial on the issue of damages.

In January 1981, Bechtel, a consulting engineering firm, contracted with WPPSS to assume the duties of construction engineer for supply system nuclear projects 1 and 4. Bechtel also agreed to use its "qualifications, resources and management capability" in specified manners to organize, manage and coordinate the entire program. It was obligated to approve the location and design of all temporary facilities, including structures used by contractor personnel. One of Bechtel's specified obligations was to "[d]evelop and execute the site safety and fire protection program." This program "supplement[ed] the contractors' programs . . . and provide[d] a unified assurance . . . that safety and health issues [were] dealt with in a positive manner." Such duties included monitoring the contractors' implementation of their safety programs and coordinating implementation of the project safety program. Bechtel agreed to conduct periodic safety inspections with Jones' safety supervisor. Violations of the safety programs were noted. Bechtel ordered contractors to comply with the requirements of the safety programs and was authorized to stop contractor operations until noncompliance was remedied. Testimony documented the broad scope of Bechtel's duties. Roger Bates, a Jones employee, observed a Bechtel safety supervisor marking as a safety hazard a faulty stairway leading into a Jones trailer. Bechtel's project safety supervisor confirmed his authority extended over "the entire Hanford Plant", including an area exclusive to Jones. With this authority, he could order a subcontractor to correct safety violations.

Jones, Ms. Riggins' employer, was one of 26 prime contractors on the Hanford site. Jones assumed certain obligations created by its predecessor who contracted with

WPPSS to perform construction work on the Hanford projects. Among these obligations were that Jones assure compliance with WISHA and OSHA standards, keep surrounding areas clear from debris, designate a "safety supervisor" to implement its safety program, and take all reasonable steps to protect the health and minimize danger from all hazards to life and property. Jones was to maintain workers' compensation insurance for its employees and indemnify WPPSS and its representatives from negligent acts of Jones employees.

In March or April 1981, a Jones employee tripped and fell over partially exposed rebar located near the Jones administrative trailer. Soon thereafter, Jones supervisor Phaedra Ganz apparently informed Bechtel's field engineer, Bobby Straisner, that the rebar was hazardous.[1] Mr. Straisner said he would have Bechtel's safety department look into the matter. Within a few weeks a second employee fell over the rebar; Ms. Ganz purportedly lodged a second appeal with Jerry Colbert, of Bechtel's safety department. Mr. Colbert acknowledged the rebar was definitely a safety hazard, and would have it removed. On October 9, Ms. Riggins was picking up Jones' mail when she tripped while stepping under the piece of rebar which had caused at least the two prior accidents.

Immediately following her fall, she was allegedly taken to the Bechtel first aid station, but returned to work that same day. Later, on October 23, Ms. Riggins consulted her physician, Lewis G. Zirkle, Jr., M.D., who concluded the October 9 accident proximately caused instability in her knee, requiring surgery.

This action against Bechtel and Atkinson, Wright, Schuchart & Harbor (AWSH), a concrete subcontractor, was brought on a negligence theory under former RCW 51.24-

---

[1]It is unclear from the record which party had the authority or duty to remove rebar. There is no indication, however, that Jones had the authority to remove rebar. Indeed, according to Ms. Ganz, Jones could not work on rebar because it did not employ an ironworker.

.030(1)[2] which allows an injured worker to seek damages against third parties "not in the same employ". RCW 51.04.010 immunizes Jones from liability for Ms. Riggins' injuries because of its coverage under the state Industrial Insurance Act. Bechtel cross–claimed against AWSH and asserted a third party claim against Jones for indemnity and/or contribution. AWSH was eventually dismissed by summary judgment.

During a jury trial, the judge denied Bechtel's motions challenging the sufficiency of the evidence and for a directed verdict, but granted Jones' motion to dismiss Bechtel's third party indemnity claim. The jury found Ms. Riggins sustained $264,116.54 in damages but that she was 40 percent comparatively negligent. Judgment for $158,469.93 was entered November 26, 1984.

Bechtel's assignments of error regarding the trial court's failure to grant its motion to dismiss, motion for directed verdict and proposed instructions 14[3] and 15,[4] all raise the first issue of whether it had a duty of care, as construction manager of the WPPSS project, to Ms. Riggins.

█ With respect to Bechtel's motions, a motion to dis-

---

[2]RCW 51.24.030(1) provides:

"If an injury to a worker for which benefits and compensation are provided under this title is due to the negligence or wrong of a third person not in the same employ, the injured worker or beneficiary may elect to seek damages from the third person."

[3]Instruction 14 reads:

"Defendant Bechtel is not responsible for any acts of negligence which you may find attributable to plaintiff's employer."

[4]Instruction 15 reads:

"A party who by contract assumes responsibility for supervising the safety programs of others at a construction site must use ordinary care in doing so. The failure to use ordinary care is negligence.

"A party charged with supervision is not negligent solely because a hazard existed at the construction site or because an accident occurred there. It is the plaintiff's burden to prove defendant Bechtel was negligent in its supervision of third party defendant J. A. Jones' safety program and that if defendant Bechtel was negligent in that regard, such negligence was a proximate cause of plaintiff's injury and damages."

miss for insufficiency of evidence requires this court accept as true the nonmoving party's evidence and draw all favorable inferences that may reasonably be evinced. RCW 4.56-.150; *Rasor v. Retail Credit Co.,* 87 Wn.2d 516, 533–34, 554 P.2d 1041 (1976); *Byerly v. Madsen,* 41 Wn. App. 495, 503, 704 P.2d 1236, *review denied,* 104 Wn.2d 1021 (1985). A similar standard applies to motions for a directed verdict. *Bertsch v. Brewer,* 97 Wn.2d 83, 90, 640 P.2d 711 (1982); *Lasser v. Grunbaum Bros. Furniture Co.,* 50 Wn.2d 191, 192, 310 P.2d 259 (1957).

Negligence consists of the existence of a duty to the complaining party, a breach thereof, and resulting damages; and, of course, the breach must also be shown to be the proximate cause of the injury. *Hartley v. State,* 103 Wn.2d 768, 777, 698 P.2d 77 (1985); *LaPlante v. State,* 85 Wn.2d 154, 159, 531 P.2d 299 (1975). Bechtel claims it had no duty of reasonable care to protect Ms. Riggins' safety because it did not employ Jones directly. But this argument is overly reliant upon contract theory to the point of losing focus of the nature of the claim made here, a claim which asserts negligence, rather than breach of contract. Long ago the courts eliminated privity of contract between the plaintiff and defendant before assessing tort liability. *See, e.g., Lewis v. Scott,* 54 Wn.2d 851, 858–59, 341 P.2d 488 (1959); *MacPherson v. Buick Motor Co.,* 217 N.Y. 382, 111 N.E. 1050, 1053 (1916). Furthermore, WPPSS specifically delegated Bechtel to supervise and execute the safety plan, giving it the authority to "stop any operations of the contractor" until violations of the safety plan were corrected. When Bechtel assumed these duties, it stood in the shoes of WPPSS with respect to the safety of any Jones employee on the jobsite.

The threshold issue is the extent of the supervision necessary to satisfy these assumed duties. In *Loyland v. Stone & Webster Eng'g Corp.,* 9 Wn. App. 682, 514 P.2d 184 (1973), the court affirmed a jury verdict against the defendant supervising engineers for injuries sustained by two of the contractor's employees, injured when a concrete

form collapsed. Stone & Webster, the engineers, were duty–bound to "supervise, direct and administer", as well as "prepare plans and specifications for . . . construction work". Stone & Webster also were to supervise the "entire construction, including all building operations" and to "provide for inspection of important items". *Loyland,* at 683. The engineers also prescribed the safety measures with which the contractor was to comply. Setting the standard of care for the engineers, the court repeated an architect's duty regarding workers on a project:

> It is the duty of an architect to act with reasonable diligence in the performance of his duties; the determination of the question of the architect's failure to meet this duty is one of fact; the skill and ability he is bound to exercise are such as are ordinarily required of architects; when the contract between the architect and owner requires inspection and supervision during construction he must exercise the same degree of care in the performance of that duty;

*Loyland,* at 687 (quoting *Miller v. DeWitt,* 59 Ill. App. 2d 38, 92, 208 N.E.2d 249 (1965), *aff'd in part, rev'd in part,* 37 Ill. 2d 273, 226 N.E.2d 630 (1967)).[5] The court concluded the extent of supervision required of the engineers in its contract with the district, and the frequency and type of inspection it required was a question for the jury, and affirmed its determination.

Similarly, in *Amant v. Pacific Power & Light Co.,* 10 Wn. App. 785, 520 P.2d 181 (1974), *aff'd,* 84 Wn.2d 872, 529 P.2d 829 (1975), a contractor's employee, injured when the contractor's crane hit a power line, claimed against the supervising engineer. The engineer's contract with the City of Yakima required that the contractor be responsible "for

---

[5]Construction managers and supervising architects have been treated similarly for the purposes of assessing duty. Bell, *Professional Negligence of Architects and Engineers* 173 (1960); Comment, *Architects' Liability for Construction Site Accidents,* 30 Kan. L. Rev. 429 (1982); *see generally* Sweet, *Site Architects and Construction Workers: Brothers and Keepers or Strangers?,* 28 Emory L.J. 291, 327 (1979). Of course, the key test for the duty of reasonable care is more an evaluation of contractual duties and the special skills and knowledge of the actor.

the methods and equipment used is [*sic*] fulfilling the Contract, *but such methods and equipment shall have the approval of the Engineer." Amant,* at 790. The engineer had the right to stop work for safety violations and had known of two previous incidents in which the crane had connected with power lines. The court determined the extent of the engineer's duty was a question of fact, and remanded the matter for trial. Other cases, based on similar facts, reach similar conclusions concerning the extent of supervision required of the engineer. *See* Annot., *Liability to One Injured in Course of Construction, Based Upon Architect's Alleged Failure To Carry Out Supervisory Responsibility,* 59 A.L.R.3d 869, 883–86 (1974 & Supp. 1985). Contractual duties considered in raising the question of the extent of supervision required of the engineer are the authority to stop work on the project,[6] and whether the engineer knew of the dangerous condition causing the accident.[7]

We also believe the question of the extent of Bechtel's duty of supervision arises because Bechtel's affirmative conduct constituted an assumption of a duty of reasonable care toward workers in administrative areas. *See, e.g.,*

---

[6]*See, e.g., Miller v. DeWitt, supra; Duncan v. Pennington Cy. Housing Auth.,* 283 N.W.2d 546, 548–49 (S.D. 1979) (architect liable based upon contractual provision mandating on–site inspections to assure compliance); *but see Simon v. Omaha Pub. Power Dist.,* 189 Neb. 183, 202 N.W.2d 157 (1972), in which the court made no finding to contradict defendant's claim that it had no authority to stop work on the project. Nor in *Geer v. Bennett,* 237 So. 2d 311 (Fla. Dist. Ct. App. 1970) was mention made of authority to stop work.

[7]*But see Miller v. DeWitt, supra* (no finding the architect had knowledge of dangerous condition before accident). *See Caldwell v. Bechtel, Inc.,* 631 F.2d 989 (D.C. Cir. 1980); *Geer v. Bennett, supra; Erhart v. Hummonds,* 232 Ark. 133, 334 S.W.2d 869 (1960). There are cases that predate these, as well as other cases in which the courts conclude supervising architects have no duty. *See* Note, *The Crumbling Tower of Architectural Immunity: Evolution and Expansion of the Liability to Third Parties,* 45 Ohio St. L.J. 217, 238–44 (1984); J. Miller, *Architect/Engineer Liability, a Growth Period* 18–21 (1984 & reprint ABA 1984); *see, e.g., Porter v. Iowa Power & Light Co.,* 217 N.W.2d 221 (Iowa 1974) (right to inspect and stop work does not constitute control sufficient to impose liability on architect).

*Brown v. MacPherson's, Inc.,* 86 Wn.2d 293, 299, 545 P.2d 13 (1975); *Sado v. Spokane,* 22 Wn. App. 298, 301, 588 P.2d 1231, *review denied,* 92 Wn.2d 1005 (1979); W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 56, at 378–82 (5th ed. 1984). Undisputed testimony documented what Bechtel believed was its contractual duty. Bechtel's safety supervisor exercised his authority by marking a stairway leading into a Jones administration trailer as a safety hazard. Furthermore, Bechtel's project supervisor testified his authority extended over the entire site to remedy safety problems. This indicates a duty of care existed; the extent of the duty was to be resolved by the jury.

Accordingly, we hold that the extent of supervision required of Bechtel in its contract with WPPSS, and the frequency and type of inspection it was required to conduct, present factual issues which only the jury could resolve from its review of the contract, exhibits and testimony presented. *Loyland,* at 687. The jury could reasonably determine Ms. Riggins' fall resulted from Bechtel's nonfeasance in the performance of its duties, either assumed or contracted.

We find this case distinguishable from the situation presented in *Porter v. Stevens, Thompson & Runyan, Inc.,* 24 Wn. App. 624, 602 P.2d 1192 (1979), where it was "clear that [the engineering firm] was not responsible for safety precautions[, and] [a]ll safety matters . . . were the exclusive province of . . . the general contractor." *Porter,* at 628. From our review of the record, and accepting as true the nonmoving party's evidence, we hold the jury could reasonably determine Ms. Riggins' fall resulted from Bechtel's failure to perform its contractual or assumed duties. Bechtel was armed with authority to inspect for safety violations, and to stop work while also possessing the special skills of one engaged in the profession of safety engineering. We find the court properly submitted the issue to the jury and find no error.

Next, Bechtel alleges the court erred in refusing to

admit its exhibit 14, showing contractors had undertaken measures to remedy safety problems at the Hanford site. The admission of evidence is within the discretion of the trial court. ER 103; 5 K. Tegland, Wash. Prac. § 14 (1982 & Supp. 1985). ER 403 authorizes the exclusion of relevant evidence if "its probative value is substantially outweighed by the danger of . . . confusion of the issues, or misleading the jury . . ." The rule has traditionally meant that the court has discretion to control distracting "side issues". *See, e.g., Maicke v. RDH, Inc.,* 37 Wn. App. 750, 683 P.2d 227 (1984). Abuse of discretion has been defined as discretion "exercised on untenable grounds, or for untenable reasons." *State ex rel. Carroll v. Junker,* 79 Wn.2d 12, 26, 482 P.2d 775 (1971); *see also Davis v. Globe Mach. Mfg. Co.,* 102 Wn.2d 68, 77, 684 P.2d 692 (1984).

Exhibit 14 is a memo dated September 4, 1981, authored by Steve Delph, Jones' safety inspector, and informing Bobby Baker, AWSH safety inspector, that Jones would correct a "tripping hazard." Reasonable minds might differ whether admission of this evidence would have confused the jury. The exhibit merely indicated that on other occasions Jones had remedied tripping hazards. While this may tend to prove a fact of consequence to the case, it may also have confused the jury by indicating that Jones alone had the duty to discover and correct hazards. We find no error.

Next, Bechtel argues Ms. Riggins was required to prove damages by expert medical testimony. It claims the court erred in refusing instruction 10,[8] and in admitting Ms. Riggins' testimony regarding her hip pain and headaches.[9] We agree. Although medical testimony proved her

---

[8]Instruction 10 reads:

"A plaintiff must establish by the testimony of medical experts that there is a probable, as distinguished from possible, causal relationship between the accident in question and a subsequent physical condition, claim or disability.

"Specifically, in the instant case, the burden is on the plaintiff to show by the testimony of medical experts that any physical conditions over which plaintiff complains were probably caused by the acts of the defendant."

[9]Because we remand for a new trial on the damages issue, we choose not to

fall necessitated surgery, no medical evidence was presented establishing that the fall caused her hip pain and headaches experienced after surgery. The need for positive expert testimony to establish a causal link between the defendant's negligent act and the plaintiff's injury depends upon the nature of the injury. Where the injury involves obscure medical factors which are beyond an ordinary lay person's knowledge, necessitating speculation in making a finding, there must be expert testimony that the negligent act probably caused the injury. *Bennett v. Department of Labor & Indus.,* 95 Wn.2d 531, 533, 627 P.2d 104 (1981). But when the results of an alleged act of negligence are within the experience and observation of an ordinary lay person, the trier of fact can draw a conclusion as to the causal link without resort to medical testimony. *Bennett; Sacred Heart Med. Ctr. v. Carrado,* 92 Wn.2d 631, 600 P.2d 1015 (1979). Of course, the injured person is competent to testify as to her past and present condition. The weight of such testimony is for the jury. *Bennett.*

Here, Ms. Riggins' and her medical expert's testimony, stating she sustained a knee injury requiring surgery, was sufficient for the jury to determine whether an injury occurred. But Ms. Riggins' testimony as to her hip pain and headaches is, standing alone, insufficient to establish cause for those aspects of the injury not apparently related to the accident and subsequent surgery. The jury was not instructed it must find medical evidence establishing that the injury and/or surgery probably caused the hip pain and headaches. This deficiency constitutes reversible error requiring a new trial on the issue of damages. *See, e.g., Henderson v. Teamsters Local 313,* 90 Wn.2d 666, 671, 585 P.2d 147, 100 A.L.R.3d 539 (1978); *Owens v. Scott Pub'g Co.,* 46 Wn.2d 666, 681, 284 P.2d 296 (1955), *cert. denied,* 350 U.S. 968, 100 L. Ed. 840, 76 S. Ct. 437 (1956).

Lastly, Bechtel contends the court erred in dismissing its

address Bechtel's claim that the damages expert improperly considered headaches and hip pain.

third party indemnity action against Jones. The contract here provides:

Contractor [Jones] shall indemnify and save harmless Owner or their [sic] representatives from and against any and all liability arising from injury or death to persons or damage to property occasioned by any negligent act or omission of Contractor, its agents, servants or employees, irrespective of whether in connection with such act or omission it is alleged or claimed that negligence of Owner or its representatives caused or contributed thereto, including any and all expense, legal or otherwise incurred by Owner or its representatives in the defense of any claim or suit relating to such injury or damage.

Bechtel claims that through this provision Jones waived its industrial insurance immunity.

█ Employers are generally immune from liability arising from their employees' job–related injuries. RCW 51.04-.010; *McDowell v. Austin Co.,* 39 Wn. App. 443, 447, 693 P.2d 744, *aff'd,* 105 Wn.2d 48, 710 P.2d 192 (1985). The employer may waive this immunity by agreeing to indemnify any third party against whom the employee is able to recover. *Brown v. Prime Constr. Co.,* 102 Wn.2d 235, 238, 684 P.2d 73 (1984); *McDowell,* at 447–48. Agreements indemnifying an indemnitee against its own negligence are disfavored, however, and the employer's intent to provide indemnification "must be clearly expressed in the agreement." *Brown,* at 239; *McDowell,* 105 Wn.2d at 52–55; *Northwest Airlines v. Hughes Air Corp.,* 104 Wn.2d 152, 158, 702 P.2d 1192 (1985). In *Brown,* at 239–40, the Supreme Court emphasized the need for clarity:

We hold that an indemnity clause of this type is enforceable only if it clearly and specifically contains a waiver of the immunity of the workers' compensation act, either by so stating or by specifically stating that the indemnitor assumes potential liability for actions brought by its own employees.

(overruling and modifying several earlier cases); *McDowell,* 105 Wn.2d at 48; *Northwest Airlines,* 104 Wn.2d at 157–58; *see also* Annot., *Liability of Subcontractor Upon Bond*

*or Other Agreement Indemnifying General Contractor Against Liability for Damage to Person or Property,* 68 A.L.R.3d 7, 69 (1976 & Supp. 1985).

Here, the indemnity clause does not refer to the workers' compensation act. Nor did Jones "specifically" assume liability for actions "brought by its own employees." *See, e.g., McDowell,* 105 Wn.2d at 49–50 (agreement indemnifies owner and contractor against all liability for injury sustained by subcontractor employee). Jones only assumed liability for losses caused by the negligent acts of its employees, which is unlike assuming liability for injuries incurred by its employees. Hence, this case is distinguishable from *McDowell,* where the language in the indemnity clause expressly provided for actions brought by persons employed by the subcontractor. *McDowell,* 105 Wn.2d at 49–50.

In addition, the indemnity agreement is between Jones and the supply system, not Jones and Bechtel. Although Bechtel claims to be a third party beneficiary to the indemnity clause, the contract expressly provides that no provision is intended or is to be construed to be for the benefit of a third party. This clause defeats Bechtel's contention that it is a third party beneficiary. *See Postlewait Constr., Inc. v. Great Am. Ins. Cos.,* 106 Wn.2d 96, 100, 720 P.2d 805 (1986) (intention to benefit is key to determining whether third party is beneficiary); *Burke & Thomas, Inc. v. International Org. of Masters,* 92 Wn.2d 762, 767, 600 P.2d 1282 (1979); *see also Ridder v. Blethen,* 24 Wn.2d 552, 561, 166 P.2d 834 (1946).

Bechtel's final argument is that it is the supply system's "representative" and therefore benefits directly from the indemnity clause. Bechtel posits that WPPSS and Jones contemplated that Bechtel would "supervise Jones as construction manager and WPPSS' representative". Since the indemnity clause is insufficiently clear, under *Brown* and its progeny, to require Jones to indemnify anyone for judgments obtained by Jones' employees, we hold it is unnecessary to decide whether a more specific clause would have

applied to Bechtel.

The judgment of the Superior Court is affirmed in part and reversed in part; the matter is remanded for a new trial on damages only.

GREEN, C.J., and MUNSON, J., concur.

Review denied by Supreme Court October 7, 1986.