# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

BONNY M. BOLSON,

               Appellant,

         v.

HAYDEN G. WILLIAMS and DONITA C. WILLIAMS, individually and on behalf of the marital community composed thereof; WILLIAMS & SCHLOER, CPA'S, P.S., a Washington professional service corporation,

               Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 71365-5-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: May 27, 2014

APPELWICK, J. — Bolson sued her former employer, W&S, alleging that W&S's negligent cleanup of the office after a flood resulted in mold growth, which proximately caused her sarcoidosis. On W&S's motion for summary judgment, the trial court dismissed Bolson's claims for lack of medical causation. We affirm in part, reverse in part, and remand.

## FACTS

Respondent, Williams & Schloer, CPA's, Inc. (W&S), is a small accounting firm located in Puyallup, Washington, near the Puyallup River. W&S is owned and managed by Respondents Hayden Williams and Donita Williams, who are husband and wife, and their daughter Tina Schloer. W&S employed Appellant Bonny Bolson as a tax accountant and enrolled agent from January 28, 2003 until December 3, 2010

In 1985, Bolson was diagnosed with a "very high allergic response to mold and mites" after she experienced unusually intense headaches and fatigue. Her doctor advised her to avoid additional exposure. Bolson moved to a new home, because her

older rental house was triggering her mold allergy. In February 2005, Bolson was again exposed to mold in her home. She experienced watery eyes, fatigue, and facial swelling as a result. She again had to move to a new home. On January 20, 2008, medical imaging of Bolson's lungs showed nothing abnormal.

On January 7, 2009, a severe storm caused massive flooding near the Puyallup River. Floodwaters rose to the first floor of the W&S office building.

The day after the flood, W&S initiated cleanup and repair of the flooded office building. W&S rented box fans and dehumidifiers, opened up the offices for ventilation, tore out all the carpeting and padding, and either dried or threw away all wet personal property. The subfloor was checked for wetness and damage, and a contractor was brought in to remove and dispose of all insulation. Bleach and other cleaning products were applied during the process.

The flood occurred during a busy tax season, so W&S set up a temporary workspace in the back of the building. However, several employees, including Bolson, worked from home during the cleanup. Bolson came to the office to get files or discuss projects with Schloer for an hour or two every couple of days. Bolson's own records indicate that she was present in the office every few days to return client calls and review files.

During the cleanup, there was a damp smell from the moisture, a smell of bleach and sawdust, and a lot of noise. Employees complained to W&S about the smell and noise of the repair work. W&S acknowledged that it received complaints from Bolson and other employees about coughing, headaches, and irritated eyes during the cleanup.

Concerned about the musty smell, a few W&S employees purchased two petri dish mold tests at the local hardware store. They put one petri dish in the parking lot as a control and one in the main part of the office. The one in the office showed a variety of mold spots and the one in the parking lot had one or two mold spots. W&S did not send the mold tests in for lab analysis. One employee remembered that W&S did not want the mold tests to be analyzed, because remediation was still ongoing.

In mid-January 2009, Bolson began experiencing flu-like symptoms, coughing, and fatigue. By February, she also began experiencing backaches and started seeing a chiropractor. In March 2009, Bolson was screened for a kidney infection, which came back negative. She continued to experience flu-like symptoms and allergies until July 2009, when she returned to the doctor. The doctors performed an x-ray and computed tomography (CT) scan on Bolson, which revealed abnormal scarring in her lungs. After biopsying Bolson's lungs, her doctors diagnosed her with sarcoidosis—an inflammatory disease that can affect any organ in the body, but most commonly affects the lungs.

In September 2009, Bolson's sarcoidosis was determined to be clinically stable. Upon evaluating Bolson and reviewing three studies on sarcoidosis, Dr. Louis Lim believed that "there is insufficient evidence to suggest that her sarcoid was the result of her work exposure on a more probable than not basis. It is possible that the environment may have contributed to the development of her illness . . . although the time frame would be unusually rapid." A colleague of Dr. Lim's agreed with this conclusion.

3

On December 9, 2010, Bolson filed a workers' compensation claim with the Washington Department of Labor and Industries (L&I), alleging sarcoidosis due to workplace exposure. L&I rejected Bolson's claim, concluding that she had not suffered an industrial injury or occupational disease required for workers' compensation benefits.

On February 29, 2012, by amended complaint, Bolson sued W&S for negligence, premises liability, negligent infliction of emotional distress (NIED), and intentional infliction of emotional distress (outrage). She alleged that W&S's negligence in cleaning up the office resulted in mold growth, which proximately caused her sarcoidosis.

On July 5, 2012, W&S moved for summary judgment. W&S argued that Bolson's claims should be dismissed, because she had not produced any expert testimony on medical causation. W&S also argued that Bolson should be collaterally estopped from pursuing claims dependent on medical causation, because she already litigated and lost the issue in her workers' compensation claim.

In her opposition to W&S's motion for summary judgment, Bolson attached a declaration from Jack Thrasher, Ph.D. Thrasher has extensive experience, training, and education in the fields of toxicology and immunotoxicology. In his declaration, he explained that toxicology is the study of the adverse effects of chemicals on living organisms, including humans. He defined immunotoxicology as the study of adverse effects on the immune system resulting from exposure to physical factors, chemicals, biological materials, and medical devices. Thrasher has specific expertise in toxicology and immunotoxicology as they apply to mold, fungi, and bacteria resulting from water intrusion in indoor environments.

Thrasher reviewed Bolson's case file, including the parties' declarations and Bolson's medical records. He explained that floodwater carries "microbes (including bacteria and mold), silt, and other organic matter into structures and create[s] black water conditions." As such, he believed that "[p]otentially dangerous and pathogenic mold and bacteria were more likely than not present in the water-damaged interior" of the W&S building. He further explained that W&S's use of box fans constantly circulated sawdust containing "mold, bacteria, pathogen by-products, and other particulates."

Thrasher stated that, because of Bolson's preexisting mold allergy, she should not have been allowed in the office during remediation. He concluded:

> 28. It is my professional opinion that Ms. Bolson's Sarcoidosis was, on a more probable than not basis, caused by her exposure to mold, its by-products, and other environmental contaminants that were present in the W&S office immediately after the January 2009 flood.
>
> 29. Further, even if Ms. Bolson had pre-existing conditions or illnesses, it is my opinion, on a more probable than not basis, that her exposure to the contaminated work environment exacerbated the injuries she suffered and continues to suffer.

Bolson argued that Thrasher's opinion was sufficient expert testimony on the issue of medical causation.

Bolson also moved to strike and exclude any evidence of her L&I claim, and moved to seal any related evidence already submitted by W&S. W&S opposed Bolson's motion to strike the L&I records.

In reply to Bolson's opposition to summary judgment, W&S asserted that Thrasher's opinion was insufficient to meet the standards for expert testimony linking a specific toxic exposure to a specific medical condition. W&S pointed out that Thrasher

did not examine Bolson, did not inspect the W&S building, and did not make any finding about specific mold that might lead to sarcoidosis. W&S argued that Bolson failed to establish a factual and scientific link between her exposure to an airborne toxin at the W&S office and her sarcoidosis.

At a hearing on W&S's motion for summary judgment, the trial court orally granted Bolson's motion to exclude the L&I records and stated that it would not rely on those records. The trial court reasoned that L&I records are discoverable for review by the parties, but not admissible for any dispositive motion.

The trial court also orally granted summary judgment for lack of medical causation. The trial court explained:

> It's not sufficient to have someone who is not a medical doctor telling the jury to draw conclusions on this sort of thing. There has to be a connection done by medical testimony as far as I read the law.
>
> I understand a reviewing court may disagree with me on that, but my reading of the reviewing courts repeatedly is that that is the requirement.
>
> Now, there are exceptions, and I appreciate that. Doctor takes off the wrong leg, you don't need a doctor telling him he took off the wrong leg; that's kind of a famous case. But this case here does require someone to draw the connection, the proximate cause between the two on a more likely than not basis. And it's not present in this case that I could find. And Dr. Thrasher doesn't have the skill. He's not the expert to do that, irrespective of his conclusions. Therefore, summary judgment will be granted.

On August 3, 2012, the trial court entered a written order granting W&S's motion for summary judgment. The court noted that it did not consider the L&I files. The trial court also denied Bolson's subsequent motion for reconsideration. Bolson appeals.

DISCUSSION

Bolson argues on appeal that the trial court erred in requiring expert testimony to establish that workplace exposure to mold proximately caused her sarcoidosis. She also argues that, even if expert testimony was required, the trial court erred in concluding that her expert toxicologist was not qualified as a medical expert under Washington law. She further asserts that the trial court erred in dismissing both her NIED and outrage claims.

We review an order granting summary judgment de novo. Hadley v. Maxwell, 144 Wn.2d 306, 310-11, 27 P.3d 600 (2001). Summary judgment is proper only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Peterson v. Groves, 111 Wn. App. 306, 310, 44 P.3d 894 (2002). We review all facts, and reasonable inferences drawn from the facts, in the light most favorable to the nonmoving party. CTVC of Haw., Co. v. Shinawatra, 82 Wn. App. 699, 708, 919 P.2d 1243, 932 P.2d 664 (1996). On a motion for summary judgment, courts do not weigh evidence or assess witness credibility. Barker v. Advanced Silicon Materials, LLC, 131 Wn. App. 616, 624, 128 P.3d 633 (2006).

In a negligence claim, the plaintiff must establish that (1) the defendant owes the plaintiff a duty to conform to a certain standard of conduct; (2) a breach of that duty; (3) a resulting injury; and (4) proximate cause between the breach and the injury. Cameron v. Murray, 151 Wn. App. 646, 651, 214 P.3d 150 (2009). To recover for NIED, the plaintiff must prove the four elements of negligence, as well as objective symptomatology. Kloepfel v. Bokor, 149 Wn.2d 192, 199, 66 P.3d 630 (2003).

7

A proximate cause of an injury is defined as a cause that, in a direct sequence, unbroken by a new, independent cause, produces the injury complained of and without which the injury would not have occurred. Fabrique v. Choice Hotels Int'l, Inc., 144 Wn. App. 675, 683, 183 P.3d 1118 (2008). Issues of negligence and proximate cause are generally not susceptible to summary judgment. Ruff v. County of King, 125 Wn.2d 697, 703, 887 P.2d 886 (1995). Only when reasonable minds can reach but one conclusion may questions of fact be determined as a matter of law. Id. at 703-04.

I.    The Need for Expert Testimony

Bolson argues that the trial court erred when it determined that expert testimony was required to establish that workplace exposure to mold proximately caused her sarcoidosis. Bolson contends that a jury could infer causation, without the need of an expert, based on the close temporal proximity between the W&S's conduct and her injuries.

When the results of allegedly negligent conduct are within the experience and observation of an ordinary lay person, the trier of fact can draw a conclusion about causation without expert testimony. Riggins v. Bechtel Power Corp., 44 Wn. App. 244, 254, 722 P.2d 819 (1986). For example, no expert testimony is required where a physician amputates the wrong limb or pokes a patient in the eye while stitching a wound on the face. Berger v. Sonneland, 144 Wn.2d 91, 111, 26 P.3d 257 (2001).

However, evidence establishing proximate cause must rise above speculation, conjecture, or mere possibility. Attwood v. Albertson's Food Ctrs., Inc., 92 Wn. App. 326, 331, 966 P.2d 351 (1998). Expert testimony is therefore required where the nature

of "the injury involves obscure medical factors which are beyond an ordinary lay person's knowledge, necessitating speculation in making a finding." Riggins, 44 Wn. App. at 254. The expert must be able to testify that the alleged negligence "'more likely than not'" caused the harmful condition leading to injury. Attwood, 92 Wn. App. at 331 (quoting Merriman v. Toothaker, 9 Wn. App. 810, 814, 515 P.2d 509 (1973)).

For instance, expert testimony was required when truck drivers alleged that multiple airborne chemicals in company trucks caused them to experience skin rashes, respiratory symptoms, nose bleeds, headaches, and other symptoms. Bruns v. PACCAR, Inc., 77 Wn. App. 201, 203, 214-15, 890 P.2d 469 (1995). Similarly, when a firefighter had multiple heart problems unrelated to his employment, expert testimony was necessary to establish whether his heart disease was caused by occupational exposures. City of Bellevue v. Raum, 171 Wn. App. 124, 153-54, 286 P.3d 695 (2012), review denied, 176 Wn.2d 1024, 301 P.3d 1047 (2013). Expert testimony was likewise needed when a hotel patron contracted salmonella in the hotel restaurant and subsequently developed a reactive arthritis. Fabrique, 144 Wn. App. at 687-88. In all three of these cases, temporal proximity between the harmful condition and the plaintiffs' injuries was insufficient to establish causation.

The same is true here. Sarcoidosis is an inflammatory disease that can appear in almost any body organ, but most commonly affects the lungs. An ordinary lay person may not be familiar with sarcoidosis; indeed, an ordinary lay person may never have heard of sarcoidosis. There is no connection obvious to a lay person between mold exposure and sarcoidosis. Thus, an expert must establish that link. Otherwise, the jury

would be left to speculate as to the possible causes of sarcoidosis. This is impermissible under Washington law. We hold that expert testimony is required to establish that Bolson's sarcoidosis was more likely than not caused by her workplace exposure to mold.

## II. Dr. Thrasher's Expert Testimony

Bolson argues that the trial court erred in granting summary judgment for lack of causation, because the court failed to properly recognize Dr. Thrasher's qualifications as an expert. Bolson contends that the trial court erroneously concluded that a medical doctor must testify to causation. Instead, Bolson argues, Thrasher's decades of experience as a toxicologist and immunotoxicologist qualify him to testify that workplace mold exposure proximately caused her sarcoidosis. Bolson asserts that any remaining challenges go to the weight and credibility of his testimony rather than its admissibility.[1]

Expert testimony must demonstrate that the defendant's conduct "'probably'" or "'more likely than not'" caused the injury, rather than "'might have,'" "'could have,'" or "'possibly did.'" Fabrique, 144 Wn. App. at 687 (quoting Ugolini v. State Marine Lines, 71 Wn.2d 404, 407, 429 P.2d 213 (1967)). Importantly, expert testimony must be based

---

[1] Bolson also argues that W&S failed to preserve any challenge to the admissibility of Thrasher's opinion, because W&S did not move to strike Thrasher's declaration or challenge his expert qualifications under ER 702. However, materials submitted in connection with a motion for summary judgment cannot actually be stricken—the trial court only refuses to consider the evidence. Parks v. Fink, 173 Wn. App. 366, 374 n.7, 293 P.3d 1275, review denied, 177 Wn.2d 1025, 309 P.3d 504 (2013). As such, a party can object to the admissibility of the evidence in a reply brief rather than by a separate motion to strike. Id. Thus, objecting to an affidavit filed in support of a motion for summary judgment preserves the issue on appeal. Bonneville v. Pierce County, 148 Wn. App. 500, 508-09, 202 P.3d 309 (2008). W&S objected to Thrasher's opinion in its summary judgment reply brief, and so we may properly consider the issue on appeal.

on the facts of the case and not on speculation or conjecture. Id. Finally, such testimony must be based upon a "reasonable degree of medical certainty." Id. at 687-88.

Washington courts have explicitly refused to create a per se rule that medical doctors must testify to causation. See, e.g., Harris v. Robert C. Groth, M.D., Inc., 99 Wn.2d 438, 449-50, 663 P.2d 113 (1983). Per se limitations on the testimony of otherwise qualified nonphysicians are not in accord with the general trend in evidence to move away from requiring formal titles and degrees. Goodman v. Boeing Co., 75 Wn. App. 60, 81, 877 P.2d 703 (1994). Training in a related field or academic background alone may be sufficient. Id. The Washington Supreme Court explained that "'the line between chemistry, biology, and medicine is too indefinite to admit of a practicable separation of topics and witnesses.'" Harris, 99 Wn.2d at 450 (quoting 2 J. Wigmore, Evidence § 569, at 790 (rev. 1979)). Thus, whether an expert is licensed to practice medicine is "certainly an important factor to be taken into account in making this determination," but is not dispositive. Id. at 450-51. Furthermore, it is worth emphasizing that the medical diagnosis of sarcoidosis is not at issue here, only the cause of the sarcoidosis.

In Loudermill v. Dow Chemical Co., the plaintiff offered expert testimony from a toxicologist with doctoral degrees in toxicology and chemistry, but not in medicine. 863 F.2d 566, 568 (8th Cir. 1988). The toxicologist testified, to a high degree of medical probability, that chemical exposure caused the plaintiff's cirrhosis of the liver and death. Id. On appeal, the defendant argued that (1) the toxicologist did not possess the proper

11

qualifications to offer expert testimony on the effects of the plaintiff's exposure to chemicals, (2) the toxicologist could not offer opinions as to medical probability because he was not a medical doctor, and (3) the toxicologist's opinions were based entirely upon speculation and conjecture. Id. at 567.

The Eighth Circuit concluded that the toxicologist's testimony was properly admitted. Id. at 570. He had extensive knowledge of toxicology and the liver, and his testimony to that effect assisted the trier of fact. Id. at 568-69. The toxicologist's lack of a medical degree went to the weight and value of his testimony, which is for the jury to evaluate. Id. at 570. He examined microscopic specimen slides, pathology and autopsy reports, government records, and publications concerning liver injuries caused by halogenated hydrocarbons. Id. This factual basis likewise went to the credibility of his opinion, not its admissibility. Id. We also recently recognized that the weight, if any, to be given to an expert's opinion based solely on a medical records review, rather than a physical exam, is within the jury's province. Raum, 171 Wn. App. at 154 n.25.

Similarly, the Third Circuit in Genty v. Resolution Trust Corp. recognized that medical doctors are not the only experts qualified to render an opinion as to the harm caused by exposure to toxic chemicals. 937 F.2d 899, 917 (3d Cir. 1991). The Genty court held that exclusion of a toxicologist's testimony "without considering his credentials as a doctor of toxicology, simply because he did not possess a medical degree, is inconsistent with expert witness jurisprudence." Id.

Dr. Thrasher has extensive experience in the fields of toxicology (45 years) and immunotoxicology (25 years). In 1964, he received his doctorate in human anatomy

and cell biology from the School of Medicine at University of California, Los Angeles (UCLA). He worked as an assistant professor of human anatomy at both the UCLA School of Medicine and the University of Colorado School of Medicine. As a professor, he conducted "research in cell biology, with a focus on the effects of aging, air pollutants, environmental radiation, and organo-mercurial compounds." He has published extensively on the topics of toxicology and immunotoxicology, and has held leadership roles at several medical and research facilities.

Dr. Thrasher defined toxicology as the "study of the adverse effects of chemicals on livings systems, whether they be human, animal, plant, or microbe." "Adverse effect" means anything from a life threatening injury to a minor annoyance. Thrasher explained that toxicology is an interdisciplinary science that integrates the fields of chemistry, biology, pharmacology, molecular biology, physiology, and medicine. Black's Law Dictionary likewise defines toxicology as the "branch of medicine that concerns poisons, their effects, their recognition, their antidotes, and generally the diagnosis and therapeutics of poisoning; the science of poisons." BLACK'S LAW DICTIONARY 1629 (9th ed. 2009).

Similarly, Thrasher defined immunotoxicology as the "study of adverse effects on the immune system resulting from exposure to physical factors, chemicals, biological materials, medical devices and, in certain instances, physiological factors, collectively referred to as agents." It encompasses the study of "immune pathologies associated with exposure of humans and wildlife species, including allergy, immune dysregulation, autoimmunity, and chronic inflammation." Thrasher has specific expertise in these

fields as they apply to "mold, fungi, bacteria, mycotoxins, and indoor environment resulting from water intrusion."

Thrasher reviewed Bolson's case file, including the parties' declarations and Bolson's medical records. Thrasher opined that the musty odor, various mold spots on the indoor mold test kit, and the employees' physical reactions "indicated mold and bacteria growth" in the W&S office building. Thus, he concluded, "[p]otentially dangerous and pathogenic mold and bacteria were more likely than not present in the water-damaged interior." Similarly, Dr. Lim believed that it was "possible that the environment may have contributed to the development of [Bolson's] illness," even though he went on to note that the "time frame would be unusually rapid." Viewing these facts in the light most favorable to Bolson, we can infer for summary judgment purposes that mold was present in the W&S office during cleanup.

From there, both Dr. Thrasher and Dr. Lim relied on research publications to support their positions. Thrasher read several peer reviewed papers on sarcoidosis and discovered at least 18 recent publications on the association of dampness, mold, and sarcoidosis. In contrast, Lim studied only three reports, which Thrasher also reviewed. Thrasher explained that even these three reports state that exposure to bioaerosols in damp indoor spaces is associated with sarcoidosis.

Based on Thrasher's decades of experience in toxicology, his specific expertise in water intrusion into indoor spaces, his review of the case files and Bolson's medical records, and his research on sarcoidosis, Thrasher concluded "on a more probable than not basis" that Bolson's workplace exposure to mold caused her sarcoidosis. And, even

14

if Bolson had preexisting conditions or illnesses, Thrasher believed, again on a more probable than not basis, that the contaminated work environment "exacerbated the injuries she suffered and continues to suffer."

These conclusions fell within Thrasher's particular area of expertise as a toxicologist and immunotoxicologist. Based on the definition in Thrasher's declaration and in Black's Law Dictionary, a toxicologist is a medical expert capable of recognizing and diagnosing symptoms caused by exposure to mold. Challenges to the factual basis of Thrasher's opinions and his lack of a medical degree go to the weight and credibility of his testimony, not its admissibility. The fact that Dr. Lim reached a different conclusion simply sets up "'a classic battle of the experts, a battle in which the jury must decide the victor.'" Intalco Aluminum Corp. v. Dep't of Labor & Indus., 66 Wn. App. 644, 662, 833 P.2d 390 (1992) (quoting Ferebee v. Chevron Chem. Co., 736 F.2d 1529, 1535 (D.C. Cir. 1984)).

Accordingly, we reverse the trial court's dismissal of Bolson's negligence and NIED claims for lack of medical causation.[2]

III. Outrage

Bolson argues that the trial court erred in dismissing her outrage claim. She contends that she does not need to demonstrate a causal connection between the

---

[2] Bolson argues that the trial court erred when it granted summary judgment on the remaining elements of negligence, because there are disputed issues of material fact. W&S argues that dismissal was proper on the alternative bases that Bolson failed to establish the relevant standard of care or any breach of that standard. However, the trial court granted summary judgment solely based on lack of causation. It is clear from the record that the trial court did not consider any of the remaining elements of negligence. Because the trial court did not consider the remaining elements of negligence, neither do we.

15

defendant's extreme and outrageous conduct and her emotional distress. She argues that the court may presume emotional distress once there is outrageous conduct.

To establish the tort of outrage, a plaintiff must show: (1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) severe emotional distress as a result. Reid v. Pierce County, 136 Wn.2d 195, 202, 961 P.2d 333 (1998). While a showing of bodily harm is not necessary, the extreme and outrageous conduct "must result in severe emotional distress to the plaintiff." Grimsby v. Samson, 85 Wn.2d 52, 59, 530 P.2d 291 (1975) (emphasis added and omitted). Bolson is incorrect that she need not show any causal connection between the purportedly outrageous conduct and her emotional distress. A causal link is clearly required.

Furthermore, Bolson fails to meet the high bar for establishing extreme and outrageous conduct. The conduct must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. (emphasis omitted) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)).

For instance, in Birklid v. Boeing Co., Boeing began using a new material in its airplanes that was impregnated with a toxic chemical. 127 Wn.2d 853, 856, 904 P.2d 278 (1995). Employees soon began experiencing harmful physical reactions to the chemical and eventually sued Boeing for outrage. Id. at 856-57. They alleged that Boeing knowingly exposed them to the toxin; removed labels on the chemical; denied access to material safety data sheets; harassed employees who requested protective

16

equipment or sought medical treatment; altered the workplace during governmental safety tests to disguise harm from the chemical; and experimented with exposing employees to the toxin without their informed consent. Id. at 857. The Washington Supreme Court concluded that the employees stated a claim for outrage based on this conduct. Id. at 868.

W&S's conduct that Bolson alleges to be outrageous includes: failing to warn the employees of unsanitary conditions; forcing the employees to work in a building with toxic particles; ignoring the employees' concerns and symptoms; and throwing away the employees' mold kit tests. However, Bolson was allowed to work from home during the repairs. W&S's conduct does not rise to the level of extreme and outrageous conduct like in Birklid. Birklid demonstrates the type of atrocious, intolerable conduct that gives rise to a colorable outrage claim. There is no comparable conduct here.

W&S did not purposefully expose Bolson to mold with the intent to cause her harm. At most, W&S was negligent in cleaning up the office space. Negligence is insufficient for an outrage claim. We therefore affirm the trial court's dismissal of Bolson's outrage claim.

IV.    Collateral Estoppel

W&S argues that we can affirm on the alternative basis of collateral estoppel, because L&I previously ruled against Bolson on the issue of medical causation in her workers' compensation claim. Bolson argues that W&S's collateral estoppel argument is procedurally barred, because W&S failed to cross appeal the trial court's order refusing to consider any L&I records on summary judgment.

RAP 2.4(a) limits the circumstances under which a respondent may seek affirmative relief. State v. Sims, 171 Wn.2d 436, 442, 256 P.3d 285 (2011). It states:

> The appellate court will grant a respondent affirmative relief by modifying the decision which is the subject matter of the review only (1) if the respondent also seeks review of the decision by the timely filing of a notice of appeal or a notice of discretionary review, or (2) if demanded by the necessities of the case.

RAP 2.4(a). A notice of cross appeal is required if the respondent "'seeks affirmative relief as distinguished from the urging of additional grounds for affirmance.'" Robinson v. Khan, 89 Wn. App. 418, 420, 948 P.2d 1347 (1998) (quoting Phillips Bldg. Co. v. An, 81 Wn. App. 696, 700 n.3, 915 P.2d 1146 (1996)).

A successful litigant need not cross appeal in order to urge additional reasons in support of the judgment, even though rejected by the trial court, so long as no additional relief is granted on appeal. Amalgamated Transit Union Local 587 v. State, 142 Wn.2d 183, 202, 11 P.3d 762, 27 P.3d 608 (2000). On the other hand, affirmative relief usually means a change in the final result at trial. Sims, 171 Wn.2d at 442. While RAP 2.4(a) does not limit the scope of argument a respondent may make, it qualifies any relief sought by the respondent beyond affirming the lower court. Id. When a respondent requests partial reversal of the trial court's decision, the respondent seeks affirmative relief and needs to cross appeal. In re Arbitration of Doyle, 93 Wn. App. 120, 127, 966 P.2d 1279 (1998).

W&S's collateral estoppel argument is not simply an additional basis for affirmance—it requires affirmative relief. W&S asserted collateral estoppel as an alternative basis to grant summary judgment below. In response, Bolson moved to

strike and exclude all the L&I records that formed the basis of W&S's collateral estoppel argument. The trial court granted Bolson's motion to exclude the L&I records and refused to consider any related evidence. Therefore, we would need to reverse the trial court's order excluding the L&I records in order to consider collateral estoppel. This constitutes affirmative relief. Because W&S did not cross appeal, we do not consider W&S's collateral estoppel argument.

We affirm in part, reverse in part, and remand.

WE CONCUR: